Submitted on motion of respondent to vacate restraining order
September 22, allowed October 7, submitted on motion of
respondent to vacate restraining order October 21,
denied November 12, 1953, argued March 17,
affirmed April 27, 1955

# DALY *v.* WOLFARD BROS., INC.

261 P. 2d 679

262 P. 2d 917

282 P. 2d 627

*Arthur E. Prag,* of Portland, for the motion.
*Glenn R. Jack,* of Oregon City, contra.

## PER CURIAM.

On August 6, 1953, during a recess of the court, Mr. Justice Lusk, on application of appellant made in chambers, granted a temporary restraining order staying execution on a judgment of the Circuit Court for Clackamas County in the sum of $3779.00 plus $31.48 costs in favor of respondent and against appellant.

From a showing in writing it appeared that appellant, in appealing from the judgment, had inadvertently

given an undertaking for costs only. Thereafter respondent caused appellant's bank account to be levied upon and was threatening to proceed with the execution of said judgment. Respondent, according to the showing, was insolvent and "any Mandate issued by this Court in favor of Appellant would be rendered nugatory because in all probability the funds taken in execution * * * would be entirely dissipated either by respondent or by his creditors." An instrument purporting to be a supersedeas bond, executed by appellant as principal and Maryland Casualty Company as surety, was tendered with the application.

Respondent has moved to vacate the temporary restraining order on two grounds: First, that the court was without power to issue it in the circumstances, and, second, that the bond tendered does not comply with the statute.

■ The second ground of the motion is good. Section 10-804, OCLA, provides in part:

"The undertaking of the appellant shall be given with one or more sureties, to the effect that the appellant will pay all damages, costs, and disbursements which may be awarded against him on the appeal; but such undertaking does not stay the proceedings, unless the undertaking further provides to the effect following:

"(1) If the judgment or decree appealed from be for the recovery of money, or of personal property, or the value thereof, that if the same or any part thereof be affirmed, the appellant will satisfy it so far as affirmed".

The undertaking tendered limits the obligation of the principal and its surety to $4000.00. Such an undertaking does not comply with the statute, which does not authorize a pecuniary limitation in any amount in an undertaking to stay the proceedings if the judgment appealed from is for the recovery of money. The in-

strument is therefore invalid and ineffectual to accomplish its intended purpose. *Sutton v. Sutton,* 78 Or 9, 11, 150 P 1025, 152 P 271; *Sanborn v. Fitzpatrick,* 51 Or 457, 459, 91 P 540.

The motion is allowed.

*Arthur E. Prag,* of Portland, for the motion.

*Glenn R. Jack,* of Oregon City, contra.

PER CURIAM.

On August 6, 1953, on application of the appellant this court granted a temporary restraining order staying the execution of a money judgment had by the respondent against the appellant in the circuit court of Clackamas county. The respondent moved for a vacation of this order upon the grounds that, first, this court was without power to issue the order under the circumstances, and, second, that the bond as tendered did not comply with the requirements of the statute. The supersedeas bond being insufficient, the order of the court was vacated.

Subsequent to the court's dissolution of the temporary restraining order because of the lack of efficacy of the bond, the appellant again renewed its application for such an order and tendered therewith a good and sufficient undertaking in compliance with § 10-804, OCLA, and on October 8, 1953, the Chief Justice of

this court granted the requested restraining order staying the execution of the respondent's judgment.

The respondent now moves to vacate this temporary restraining order on the ground that the court was without power to issue it because prior to the issuance of the restraining order a writ of execution had issued out of the circuit court of Clackamas county and a levy had been made upon the appellant's bank account.

■■ At common law a supersedas bond in order to effect the stay of the proceedings on execution necessarily had to come before a levy was made under the execution. 4 CJS 1152, Appeal and Error, § 667; 3 Am Jur 199, Appeal and Error, § 544. This on the theory that the levy under the execution and the sale was entire and indivisible and that the execution was regarded as fully executed from the time of the levy. Generally, this common law·rule has been abrogated under appeal statutes such as § 10-804, supra. Where a good and sufficient bond is provided for the full protection of the respondent "* * * the general rule now is that a supersedeas becomes effective notwithstanding a levy, and stays further proceedings thereunder, * * *" 4 CJS 1152, Appeal and Error, § 667. See also 3 CJ 1323, Appeal and Error, § 1450, note 78.

In any event, the appellant has filed an affidavit, which is uncontroverted, to the effect that the respondent is insolvent, that the moneys obtained upon the execution would immediately be "entirely dissipated either by respondent or his creditors", and should the cause be reversed the appellant's appeal would even then be fruitless as the parties could not again be placed in status quo.

■ This court has said "The grant of appellate jurisdiction, whether made by the constitution or by statute, necessarily vests in such court all powers of

an incidental nature required to make the granted jurisdiction effective''. *Livesley v. Krebs Hop Company,* 57 Or 352, 97 P 718, 107 P 460, 112 P 1. And it appears in this matter, as in the case just cited, ''* * * the threatened enforcement by execution of the judgment, which is the subject of this suit, would operate to satisfy the judgment, and thus nullify any decree this court might render relating thereto, or at least render such a decree difficult of enforcement. * * *'' (*Livesley v. Krebs Hop Company,* supra).

The respondent can suffer no loss as the undertaking now in force requires full satisfaction to the respondent of his money judgment insofar as affirmed.

The motion to vacate the restraining order is denied.

ON THE MERITS

*Glenn R. Jack* and *James O. Goodwin,* of Oregon City, filed a brief for appellant.

*Arthur E. Prag,* of Portland, argued the cause and filed a brief for respondent.

Before Warner, Chief Justice, and Tooze, Lusk and Brand, Justices.

TOOZE, J.

This is an action for the conversion of an automobile, brought by Walter M. Daly, as plaintiff, against Wolfard Bros., Inc., as defendant. The jury returned a verdict in favor of plaintiff for $1,279 compensatory damages and $2,500 punitive damages. Judgment was entered accordingly, and defendant appeals.

Defendant is an Oregon corporation engaged in the sale of new and used automobiles and in general car repair work, with its principal place of business located in Oregon City, Clackamas county, Oregon. James Wolfard is the president and general manager of defendant corporation. During the month of May, 1952, plaintiff purchased from defendant a used 1951 Mercury convertible automobile, which had theretofore been driven approximately 4,500 miles. The automobile in question was equipped with an old "hot rod" motor rather than the power plant originally installed therein, which fact was disclosed to plaintiff. However, with the exception of the motor, defendant warranted the car as a new car; that is, it warranted it for 4,000 miles or 90 days, whichever should first occur, that being the customary new car factory warranty.

As a part of the transaction, plaintiff sold and delivered to defendant a used Jaguar automobile owned by him. One fender skirt was missing from the Jaguar,

which plaintiff agreed should be replaced at his expense.

Between the date of purchase of said Mercury automobile in May, 1952, and the end of July, 1952, there were three items of repairs, the costs of which made up a disputed bill between plaintiff and defendant. One item consisted of a disputed bill for $23.50 to put the "hot rod" motor in reasonable running order shortly after the car was purchased. The second item was $249.95 to repair damage done to the rear end of the car when the rear wheels locked for no apparent reason. The third item of $8.27 consisted of the cost of a fender skirt purchased for the Jaguar.

As to the item of $249.95, James Wolfard submitted it to the Mercury division of the Ford Motor Company, in the hope that the manufacturer would take care of it under its original factory warranty. Inasmuch as the automobile had been operated several thousand miles in excess of its new car warranty when the damage occurred, the Ford Motor Company refused to acknowledge the claim. This item was the principal bone of contention between plaintiff and defendant. Plaintiff claimed, and there is substantial evidence to support his contention, that the damage occurred within the period warranted by defendant.

On August 11, 1952, plaintiff purchased from defendant the new motor which had been removed from the car at the time of its first sale, and had it installed in place of the "hot rod" motor. Defendant warranted this new motor for 4,000 miles or 90 days, whichever should first occur.

On September 4, 1952, defendant prepared and filed with the county clerk of Clackamas county its notice of lien against the Mercury for the several items of charge above mentioned.

The new motor installed in the car needed tuning up, and plaintiff drove it into defendant's garage for that purpose on October 2, 1952. Dale Matzke, foreman of defendant's repair shop, told plaintiff that "Jim Wolfard has heard from the Mercury Motor Car Company regarding the rear-end damage to your car. He is in his office." Plaintiff went to Wolfard's office, where the following occurred:

"* * * So I went in and talked with Mr. Wolfard regarding this. He showed me the letter; the Mercury Motor Car Company disclaimed any responsibility. Their reason for disclaiming responsibility is the fact that they themselves warranty the car for the 90 days or 4,000 miles, whichever comes first. The car had passed the 4,000 miles before I bought it, and I was the second owner, so they disclaimed any responsibility. So in my conversation with Jim Wolfard, why he said they refused to pay for it, and I said, 'Well, it looks like you are stuck for the damage, then.' It was $249.95, I believe. And he said, 'No, we're not stuck; you are.' I told him that the car was still within its warranty period. He said, 'You have driven it over 4,000 miles,' and I said, 'Yes, a few hundred miles over, and that is all.' He said, 'We're not responsible for that; you are, and you're going to have to pay for it.' I told him that I could not pay for it, that the only thing to do was to settle it in a legal manner; it was a disputed bill.

"Mr. Wolfard then reached in his desk and pulled out a lien that he had had filed against the automobile, a mechanic's lien, I believe you call it, and tapped his desk with it and he said, '*Well, you either give me a check for that damage or you're afoot.*' And I asked him please to handle it in a different manner as we were friends, social friends and whatnot, that that wasn't the normal way to do business I didn't think. He said, '*No*,' *that either he had to have the money or I was afoot,* to pay him and then I could in turn sue him. Well, I understand that I could not have paid that bill and

turned around and sued him for it, that I would have acknowledged indebtedness had I paid him, which I explained to him. He said, *'Well, then, there's only one thing that I can do,* and' he said, *'that is to keep the car.'* He said, *'You could take that car over to Vancouver and sell it.'* I said, 'Well, Jim, good heavens, I'm pretty well established around here. You've known me; I'm not a transient or itinerant worker. You sue me for it and we'll settle it in court,' which he refused to do; or that is, he stated, 'No,' that there was only one thing left for him to do and that was hold the car. And he said, *'I'm afraid my only answer now is to hold this car if you refuse to pay this bill, then in turn sell this car and pay off everything that is against it and give you whatever is left over.'*

"I called my attorney, Mr. Prag. Mr. Prag advised me of my rights. He told me that Mr. Wolfard was leaving himself open for conversion and punitive damages and to call his attorney, tell him to call his attorney, which I did. I told Mr. Wolfard that he was leaving himself open for conversion, an act of conversion and punitive damages, being sued for such, and would he please call his attorney. His retort to me, *'Well, I'll probably talk to my attorney before this thing is over, but I've done this lots of times and I know what I'm doing, so you either give me a check or you're afoot.'* I called my attorney again and told him that Mr. Wolfard refused to contact his attorney and was insisting on holding this automobile. My attorney informed me that I must make demand upon him for that automobile, which I did. I made demand on him. He brought up the matter of the check again, and I said, 'No,' I could not give him—I could not pay him for that damage because it would admit the bill and, therefore, I could not recover at any time, and that I demanded my automobile, which I used in my work. Mr. Wolfard said, *'I'm sorry; you're afoot. You don't have an automobile'.* So I asked him where one caught the streetcar, which was right across on the corner, and I went over and got a

streetcar into Portland, met my attorney and my wife. Then, the following morning my attorney drew up the necessary papers, and I brought them out here to the Court House and filed them, which is the suit in conversion.'' (Italics ours.)

Wolfard admitted that plaintiff related to him what Prag had said in plaintiff's conversation with him over the telephone. In fact, he did not deny any of the substance of the conversation between himself and plaintiff, as related by plaintiff. Plaintiff called Prag from Wolfard's office.

It is manifest from the foregoing that Wolfard was holding plaintiff's automobile upon the theory that he had the right to do so because of the lien notice that had been filed, but after having been informed by plaintiff as to what Prag had said about defendant having no right to so hold the car, and after he had been asked to call his own attorney respecting the matter, Wolfard insisted upon putting, and did put, plaintiff afoot, thereby completing the conversion. This action was commenced early the next morning. What Wolfard did on October 3 by way of offer to deliver possession of the car to plaintiff is wholly immaterial. The tuning up process had been completed on the car before plaintiff left Wolfard's office.

The evidence clearly established the fact that there was to be no charge for the ''tuning up'' of the motor. Such work come within the warranty. Yet, in its answer, defendant alleged a charge of $3.50 for that work and claimed that on October 2 it held the car under a possessory lien for the payment of that amount. From defendant's own office records it was made to appear that the $3.50 charge was clearly an afterthought. To support its claim in that respect, it is quite apparent that defendant manufactured a bit of written evidence; at least the jury was fully justified

in so finding. Under defendant's system of bookkeeping, a record is made of each repair order, each order bearing a separate number. These orders are kept in book form and numbered in the order in which they are taken. Orders Nos. 664 to 671, inclusive, were introduced in evidence. Orders Nos. 664 to 667, inclusive, are each dated October 3, 1952; order No. 668 is dated October 4, 1952; *order No. 669, allegedly that of plaintiff Walter Daly to "Adjust New Motor", is dated October 2, 1952;* orders Nos. 670 and 671 are dated October 5, 1952. Neither Wolfard nor Matzke could explain this record. Matzke makes up the orders. If this order form was made up on October 4 or 5, as it seems likely it was, then it was prepared after this action had been commenced and had no bearing whatever upon the transaction that occurred between plaintiff and Wolfard on the afternoon of October 2 as above set forth; Wolfard could not possibly have had that charge in mind when he put plaintiff "afoot".

As its first assignment of error, defendant contends that the trial court erred in refusing to withdraw from the jury's consideration the issue of punitive damages.

Defendant asserts that "punitive damages are not recoverable merely because a conversion took place. The plaintiff must prove not only that a conversion occurred, but also that defendant's wrongful conduct was attended with aggravating circumstances." It cites the case of *Perry v. Thomas et al.,* 197 Or 374, 253 P2d 299, in support of this doctrine. There is no doubt but that is the established law of this state, and it was applied in *Perry v. Thomas,* supra. However, the facts in the case of *Perry v. Thomas* were much different from the facts in the case at bar. There the actions of defendants were induced by an honest mistake as to their rights; there were no aggravating cir-

cumstances attending their taking possession of the motor vehicle involved.

In this case it is obvious that there were aggravating circumstances. After being fully informed that defendant had no right to hold plaintiff's car, and after being requested to call his own attorney respecting the matter, James Wolfard, acting for the defendant without consulting with his own attorney, arbitrarily refused to let plaintiff take the car. He wrongfully demanded that plaintiff pay the disputed claims in full or be put ''afoot''. He even insulted plaintiff by suggesting that ''he might go to Vancouver and dispose of the car'', if possession were surrendered to him. It is true that in its brief in this court, defendant places a different construction upon this ''sale in Vancouver'' statement, claiming that Wolfard merely offered to plaintiff that he take the car to Vancouver and sell it, or in the alternative, leave it with defendant to be sold and the proceeds delivered to plaintiff, less defendant's outstanding bills against it. Defendant's present version of the statement does not ring true and directly conflicts with the position defendant actually took; viz., that plaintiff should pay the disputed amounts at once or be without his car. It is manifest that the jury did not agree with defendant's present claim.

Defendant's first assignment of error is without merit.

■ Defendant next assigns as error the refusal of the trial court to allow its motion for a nonsuit and a directed verdict.

There is no merit whatever in this assignment of error. There is an abundance of satisfactory evidence in the record to sustain the verdict. It is argued by defendant that its refusal to deliver possession of the car to plaintiff was a limited or qualified refusal. De-

fendant claims that such a refusal does not, per se, constitute a conversion, citing 53 Am Jur 842, Trover and Conversion, § 45. It is in support of this contention that defendant now says it offered to let plaintiff take the car to Vancouver and sell it, or in the alternative, that it be left in defendant's possession for sale. Whether Wolfard had in mind Vancouver, Washington, or Vancouver, British Columbia, the record does not reveal. But as we have observed, the statement actually made by Wolfard as related by plaintiff will not bear that interpretation, or at least the jury could so find. The rules of law stated in defendant's brief are sound, but they are in no way applicable to the situation in this case. Defendant's refusal to permit plaintiff to take his car was unequivocal; the car could be taken by plaintiff on one condition only: "pay up everything we claim you owe—that is, the full amount of the disputed claims—and then you may take the car; otherwise, not." This was a high-handed, wrongful, and unlawful deprivation of plaintiff's rights. It was a conversion of plaintiff's automobile under most aggravating circumstances.

■ Defendant had no right to hold plaintiff's car under the lien it filed September 4, 1952. That lien was filed pursuant to the provisions of § 67-601, OCLA (ORS 87.085). The method of foreclosure of such a lien is provided for in § 67-606, OCLA (ORS 87.110; 87.115), and it cannot be foreclosed otherwise. The holder of the lien has no authority to take possession personally and arbitrarily of the property to enforce his lien. Section 67-501, OCLA (ORS 87.080), provides for a possessory lien, the type of lien defendant asserts in its answer in this case, but which it failed to establish to the satisfaction of the jury. As to possessory liens in general see *Yellow Mfg. Accept. Corp. v. Bristol,* 193 Or 24, 36, 236 P2d 939.

■ As its third assignment of error defendant complains that the trial court erred in instructing the jury as follows:

"You may presume a malicious and guilty intent from the deliberate commission of an unlawful act for the purpose of injuring another."

This is but part of an instruction given by the court. To understand it, attention must be given to the entire instruction. The court said:

"Now, in addition to asking for what I have described to you as compensatory damages, the plaintiff has also asked for punitive damages in the sum of $5,000. Exemplary or punitive or vindictive damages involves the blending of the interests of society in general with those of the aggrieved individual in particular. Such damages are awarded by way of punishment to the offender and as a warning to others or by way of example. In order to recover exemplary damages or punitive damages, there must be actual damage shown. In other words, you would have to first determine that there had been general damage or compensatory damage before you would be entitled to return a judgment for punitive damages. In order to warrant a recovery for exemplary damages, there must be some element of malice. A guilty intent on the part of the defendant is essential to charge it with exemplary or punitive damages. Where an act has been done in good faith although it may result in serious injury to the other party, there can be no recovery for exemplary damages. If the defendant acted under a mistaken sense of duty and without an evil intent, it is not a case of exemplary damages. You may presume a malicious and guilty intent from the deliberate commission of an unlawful act for the purpose of injuring another."

There was no error in the instruction.

The judgment is affirmed.