Argued April 4, affirmed May 10, 1967

RHODES ET UX, *Respondents, v.* BEAVER
FINANCE COMPANY, *Appellant.*

427 P. 2d 420

*John Paul Jones,* Portland, argued the cause and filed a brief for appellant.

*Claud A. Ingram, Jr.,* Portland, argued the cause for respondents. With him on the brief were Cake, Jaureguy, Hardy, Buttler & McEwen, Portland.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

McALLISTER, J.

This is an action for wrongful attachment in which the jury awarded plaintiffs $1,000 general damages and $2,500 punitive damages. Defendant appeals and assigns as error only the award of punitive damages.

Since the only question is whether there was evidence to support the award of punitive damages, we must consider the evidence in the light most favorable to plaintiffs. *McCarthy v. General Electric Co.,* 151 Or 519, 520, 49 P2d 993, 100 ALR 1370 (1935); *Pelton v. Gen. Motors Accept. Corp.,* 139 Or 198, 200, 7 P2d 263, 9 P2d 128 (1932).

There was evidence from which a jury could have found the facts as hereinafter set out. About February 13, 1963, plaintiff T. J. Rhodes borrowed money from defendant to purchase a 1955 Buick sedan. The indebtedness initially amounted to $512.25. According to Rhodes he bought this car as an accommodation for a friend who was to use it as transportation to and from work and who agreed to make the payments on the loan. Neither Rhodes nor his friend made any payment on the debt, and the Buick was eventually repossessed by defendant. There was evidence that Mrs. Rhodes telephoned defendant, told where the

Buick was located, and asked defendant to pick it up. The car was in need of extensive repair and was "junked" for $42.50.

On February 24, 1964, defendant loaned plaintiffs an additional $250, which according to Rhodes was to help his anonymous friend get another car to replace the Buick as a means of transportation. After this transaction the amount owing defendant was $837.96. On May 3, 1964 the loan was again renewed, with some minor additional advances, making a new balance of $919.83. As a part of these renewals defendant acquired a lien on the newly purchased car, a 1955 Pontiac station wagon. There was no change in the record of non-payment—neither Rhodes nor his friend made any payment on the debt, either before or after renewal.

Defendant's office manager, Mrs. Mulvaney, made many calls at plaintiffs' home in an effort to collect something on the debt but without success. Rhodes testified that he was unable to pay because he was suffering from myasthenia gravis[①] and had been unable to work for a protracted period. On August 6, 1964 Mrs. Mulvaney told Rhodes that unless he made a payment they would have to take the Pontiac. Rhodes said he was unable to make a payment and permitted Mrs. Mulvaney to take the car. The repossession was accomplished harmoniously, and the car was stored by defendant on a private parking lot. Defendant through newspaper advertising solicited bids on the car. No bids were received and defendant continued its efforts to induce Rhodes to pay something on the debt.

On one of his calls at plaintiffs' home, probably in

[①] "Myasthenia gravis. A disease marked by abnormal fatigue and quick exhaustibility of the muscles." Schmidt's Attorneys' Dictionary of Medicine (1965).

September, 1964, defendant's president Mr. Brecken-ridge saw a 1961 Cadillac convertible sitting in front of the house. Breckenridge took the license number and by inquiry of the Motor Vehicle Department and the Pacific Finance Co. learned that the car was registered to plaintiffs under their nicknames of "Willie" and "Janice", and that the Pacific Finance had legal title to the car as security for a debt of $2,351.30. The manager of Pacific Finance testified that the value of the Cadillac was then about equal to the balance owing on its mortgage.

Rhodes testified that after Breckenridge found out about the Cadillac he threatened to take it away from plaintiffs unless they paid the debt owing defendant.[2]

On October 8, 1964 defendant filed an action against plaintiffs to recover judgment for the debt owing by plaintiffs. On the same day defendant, through its manager, Mrs. Mulvaney, filed an affidavit for a writ of attachment stating that the action was based on a promissory note "which is not secured by mortgage, lien or pledge." Based on the affidavit, a writ of at-

---

[2] Rhodes testified as follows:

"A. Yes, I did. I went over there several times and he called me several times and he was real nasty about it, the way he talked about it. He called me and I explained to him I was sick and he just hollered and said, 'I don't give a damn,' excuse me, that is what he said, 'I got to have some money on this loan.' And when I went over there to talk to him he said, 'Do you have any money?' I said, 'No, I don't have any money.' And he said, 'What are you going to do about it?' And I said, 'How much do I owe you?' And he said—he got the deal out and he said he loaned me $299 on the Pontiac—I mean $250 on the Buick and $399 on the Pontiac and so with all the interest added up—I don't know with the cash he loaned me on the car, he had a bill of $800. I said, 'I don't think $800 is right.' He said, 'You see here, you signed this.' I said, 'I see the signature, but I don't feel like I owe it. You took both cars back, and what have I got?' And he said, 'I don't care how you feel about it you signed this and you're going to pay us. If you want that Goddam Cadillac pay up or we'll take it.' That is what he said."

tachment was issued and on October 15, 1964, the sheriff attached plaintiffs' 1961 Cadillac convertible by taking it into his possession and placing it in storage. Mrs. Mulvaney testified that she had been employed by defendant for about three years and that to the best of her knowledge this was the only attachment action which had been instituted by defendant during that time.

When the affidavit for a writ of attachment was executed defendant still had the Pontiac and was apparently still trying to sell it. On October 23, 1964 Rhodes brought to defendant's office a Mrs. Franklin who was a prospective purchaser for the Pontiac. Mr. Breckenridge gave her a memorandum describing the Pontiac and listing the "as is" price at $150 net. Mrs. Franklin looked at the car but did not buy it, or make any offer for it.

Rhodes testified that after his Cadillac was attached he talked to Breckenridge, who demanded first $250 and then $200 on account before he would release the car.[9] Rhodes made no payment, but consulted an attorney.

---

[9] [Rhodes on direct examination]

"A. * * * I asked him, Mr. Breckenridge, what about that, what about that car, and he said, 'What about my money?' And I said, 'I don't have any money' and he said, 'You don't get no car.' And I said, 'How much do I have to have?' And he said $250. I said, 'I don't have $250 and there is no where I can get it.' He said, 'I don't care how you do it, that is what you got to get.' I said 'Well, we will get it.' I don't have no $250 because the car, I was paying for it, and I had it fixed with a group of guys going different places and they helped me with the note and things. That is how I had kept the car, the Cadillac up. He said, 'I don't care where you get the money, you get $250 and you bring it and we will talk about it.' He said, 'Do you have $200?' I said, 'No.' And he said, 'The hell with it,' and hung up. That is when I contacted you.

"Q. Now, you contacted me, when was that?

"A. It was the same evening after he had taken it [the Cadillac]."

On October 26, 1964, plaintiffs filed a motion to quash the writ of attachment. On November 6, 1964, there was filed in the attachment action a "counter-affidavit" of defendant's manager, Mrs. Mulvaney, stating that on August 6, prior to the attachment, the Pontiac had been repossessed by the defendant and that the value of the car was less than half of defendant's cost of repossession and storage, and that the car was valueless and defendant's claim without security.

On November 13, 1964, the court entered an order quashing the writ of attachment. The evidence does not disclose precisely when the Cadillac was returned to plaintiffs, but the jury could have found that it was at least ten days after it was attached.

This action was filed on December 9, 1964. On January 13, 1965 defendant sold the Pontiac to Delbert Mulvaney, its manager's brother-in-law, for $20.

We start in this case with the assumption that defendant's conduct in attaching the Cadillac was wrongful. The jury so found, and although defendant has appealed from the entire judgment, it has raised no question concerning the pleadings or the sufficiency of the evidence to support the award of general damages. This leaves for consideration the narrow question of whether defendant's conduct was attended by aggravating circumstances justifying an award of punitive damages. *Genova v. Johnson,* 213 Or 47, 55, 321 P2d 1050 (1958); *Daly v. Wolfard Bros., Inc.,* 204 Or 241, 253, 261 P2d 679, 262 P2d 917, 282 P2d 627, 54 ALR2d 1355 (1955).

■ We think there was sufficient evidence of aggravation to require submission of the issue to the jury. At the outset we have the false affidavit stating that the debt was unsecured, when in fact defendant had a lien on and possession of the Pontiac which it was at-

tempting to sell for approximately $150. There is also the circumstance that defendant did not promptly release its attachment when the falsity of the affidavit was called to its attention. On the contrary, defendant resisted the motion to quash the attachment with an affidavit that the Pontiac which it was trying to sell for $150 was worthless. Aside from the foregoing, the jury could have found that the Cadillac was attached only to harass plaintiffs and to coerce them into making some payment on their debt to defendant. The evidence is undisputed that for about three years the defendants had not attached the property of any other debtor. It is also undisputed that the value of the Cadillac did not exceed Pacific Finance's lien thereon. Defendant had no hope of recovering anything by selling the Cadillac on execution sale. Under those circumstances the jury could infer that defendant was motivated only by a desire to harass plaintiffs and to thereby coerce them into paying something on their debt to defendant.

We think the trial court did not err in submitting the issue of punitive damages to the jury, and the judgment is affirmed.