Argued July 8, 1971, affirmed February 2, 1972

# RICHMOND, *Respondent, v.* FIELDS CHEVROLET CO., *Appellant.*

493 P2d 154

*R. Alan Wight,* Portland, argued the cause for appellant. With him on the briefs were King, Miller, Anderson, Nash & Yerke, Portland.

*John A. Pickard,* Portland, argued the cause for respondent. With him on the brief were Dardano & Mowry, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, HOWELL, and BRYSON, Justices.

BRYSON, J.

Plaintiff brought this action for conversion of his 1966 Chevrolet automobile and demanded general and punitive damages. The defendant filed a general denial and affirmatively pleaded facts asserting plaintiff's indebtedness to defendant for $32 representing repairs to the automobile, and that this entitled defendant to retain possession of the automobile by reason of its lien for repairs. Judgment was entered for the plaintiff, on the jury's verdict, granting $1,200 general damages and $2,500 punitive damages. Defendant appeals.

On the morning of May 27, 1969, plaintiff's wife took the automobile to the defendant's place of business

to have it inspected to find out what was wrong with it. She talked to Mr. Paxton, defendant's service writer. She testified:

> "I asked him if he could inspect the car there. I did not want any work done on it * * * I just wanted to find out what had to be done and how much it was going to cost. And he said 'Fine.' "

She signed a work order, which was received in evidence. It provided, "Pull valve cover    inspect valve keepers    see why engine knocks    Owner will call at 11:00 * * * Promised 5 PM [car] * * * An express mechanic's lien is acknowledged on this vehicle to secure the amount of repairs thereto * * * TERMS: STRICTLY CASH UNLESS ARRANGEMENTS MADE." She failed to call at 11:00 a.m., but on May 28, 1969, she called and was informed that nothing had been done to the car and to call the next day. On May 29 she was told it would cost $600 to fix the automobile but was not told what was wrong with the car. On May 29 the plaintiff also went to defendant's place of business and talked to Mr. Paxton. He affirmed the $600 repair cost, and plaintiff demanded that his automobile be returned to him. Mr. Paxton and the plaintiff tried to find the plaintiff's automobile and they looked on several of defendant's car lots, but to no avail. Plaintiff returned to the defendant's place of business on May 30 in search of the automobile and was again taken to several car lots. They finally located the automobile in the main building, with the motor disassembled. This was the last time plaintiff saw his automobile.

On the day the car was taken to defendant, the shop foreman could not find the "knock" in the motor and decided it was necessary to remove the engine from

the car to "get the oil pan off" (a peculiarity of this model 1966 Chevrolet). On direct examination he testified:

"Q What problem did you find when you got the oil pan off of the automobile?

"A I found the rear main bearing has [sic] spun in the block, damaging the engine block."

The defendant refused to reassemble and return plaintiff's automobile.

On June 11, 1969, plaintiff's attorney wrote to defendant demanding that defendant "* * * reassemble the vehicle in as good condition as the same was upon delivery to you. Mr. Richmond will appear on your premises Friday, June 13, 1969, at 5 o'clock to obtain delivery of this vehicle in the condition aforesaid. Failure on your part to so deliver will be considered as a permanent conversion * * *." On June 17, 1969, defendant replied, "* * * [t]he existing bill against the car is $32.00 for taking the engine down and inspecting. If we were to reassemble the engine, the total bill would be $64.00 for labor plus $2.60 for four quarts of oil and $2.85 for a pan gasket, a total of $69.45 * * * If Mr. Richmond wishes the car to be worked on elsewhere this, of course, is agreeable and we will release it upon payment of the $32.00 labor bill."

The facts are further complicated because the Richmonds had purchased the car from defendants in 1967 and financed the purchase through a retail installment contract held by the First National Bank of Oregon. They were delinquent, or slow, in making monthly payments, although they mailed a money order to the bank the first part of July, covering the

July, 1969 monthly payment. The bank refused to accept the money order and returned the same to them.

On June 19, 1969, the bank wrote the defendant as follows:

"This will confirm our representations to you that the First National Bank of Oregon, as legal owner, is entitled to the possession of the above automobile because of default in regular monthly payments.

"Therefore, we would appreciate your releasing this vehicle to our representative * * *."

The bank paid the defendant $47 for the repair charges on the automobile. The bank took possession of the car with the disassembled motor in the trunk and thereafter sold the car in this condition for $427. On July 22, 1969, the bank wrote the plaintiff, advising that it had repossessed the car as of July 21, 1969.

The defendant states numerous assignments of error but where they present essentially the same legal question they will be combined, so far as practicable, pursuant to Rule 2.35 of this court.

The defendant contends that the trial court erred in denying its motions for an involuntary nonsuit and for a directed verdict because there was no evidence to support the plaintiff's allegations that his automobile was converted by defendant, relying upon *Mustola v. Toddy*, 253 Or 658, 456 P2d 1004 (1969).

In *Mustola* we accepted the definition of conversion adopted by Restatement (Second) Torts, § 222 A:

" '(1) Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.

" '(2) In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important:

" '(a) the extent and duration of the actor's exercise of dominion or control;

" '(b) the actor's intent to assert a right in fact inconsistent with the other's right of control;

" '(c) the actor's good faith;

" '(d) the extent and duration of the resulting interference with the other's right of control;

" '(e) the harm done to the chattel;

" '(f) the inconvenience and expense caused to the other.' " 253 Or at 663, 664.

■ The defendant argues that it had possession of the automobile for only a temporary, or short, time and had nothing to do with the repossession and sale of the automobile, and the possession constituted a mere trespass which was not sufficient to show a conversion. The trial court instructed the jury on the issue of conversion in language announced in *Mustola* and that the law presumes that one accused of converting property of another is innocent of such accusation. Applying the definition of conversion to the facts of this case, the jury could find that the defendant did exercise such control or dominion over plaintiff's automobile as to justify that defendant pay the full value of the vehicle.

The facts make the issue of conversion a jury question within the framework of the rule laid down in *Mustola*. The court did not err in submitting this issue to the jury.

The defendant, in this connection, also contends that the court refused to give a requested instruction which stated:

"* * * Therefore, if you find that defendant in-

terfered with plaintiff's right to control the automobile at a time when plaintiff had a right to immediate possession thereof, but that such interference is not such a serious, major, and important interference with the right to control the automobile as justified requiring the defendant to pay its full value, your verdict must be for the defendant."

We feel that other instructions of the court properly covered this matter but, in addition, it was not error for the court to refuse the instruction in the requested form because it destroys the neutral form that instructions should have. *See Royer v. Wendland,* 261 Or 1, 492 P2d 280 (1971); *Ginter v. Handy,* 244 Or 449, 451, 419 P2d 21 (1966).

■ Defendant also assigns as error the court's refusal to find as a matter of law that plaintiff was entitled to retain possession of the automobile under a mechanic's lien. The court denied defendant's motions for an involuntary nonsuit, directed verdict and new trial. The thrust of this argument is that the defendant had either a possessory lien under ORS 87.080 (1), an implied lien, or an express lien pursuant to the terms of the work order signed by Mrs. Richmond and, therefore, not liable for conversion because they were entitled to retain possession of the vehicle until the amount of the lien was paid. ORS 87.080 (1) provides:

"Any person who makes, alters, repairs or bestows labor on any article of personal property *at the request* of the owner or lawful possessor thereof, shall have a lien on the article for his just and reasonable charges for the labor he has performed and material he has furnished, and he may retain possession of the article until such charges are paid." (Emphasis supplied.)

On the face of the work order signed by Mrs. Rich-

mond there also was printed in small type: "I hereby authorize the below repair work to be done along with necessary materials. * * * An express mechanic's lien is acknowledged on this vehicle to secure the amount of repairs thereto * * *."

Plaintiff contends that Mrs. Richmond requested that the car only be inspected to find out how much it would cost for repairs, and if labor is bestowed on the chattel, the labor must be that which is requested; also, that labor bestowed by defendant *in excess of* "pulling the valve covers" was not requested or authorized and, therefore, defendant did not have a possessory lien for the amount demanded. The defendant argues that even "pulling the valve covers" requires the expenditure of some labor that would give defendant the right to a possessory lien.

In *Yellow Mfg. Accept. Corp. v. Bristol,* 193 Or 24, 36, 236 P2d 939 (1951), this court, in construing Section 67.501 OCLA (predecessor to ORS 87.080), stated:

"This statute is declaratory of the common-law right to a possessory lien and must be interpreted in accordance with its principles. [Citations omitted.]"

■ A lien on chattels, in its broadest sense, is a claim on personal property and gives the party claiming the lien a right to hold the chattel as security for the debt. However, it is essential to the existence of a lien on property that there be a valid indebtedness due from the owner of the property to the claimant. 51 Am Jur, Liens § 64; 53 CJS, Liens § 9.①

_____

① "In cases where there has been a deviation from the terms of the contract, by doing any extraordinary work, or by using materials of a superior quality or value, not contemplated by

██ The work order, Exhibit #12, authorized defendant to pull the valve cover and inspect the valve keepers to see why the engine knocked. It is evident from the testimony that Mrs. Richmond, or even Mr. Paxton, defendant's employee, did not contemplate removing the motor from the car and taking the pan off the motor and dropping the crank shaft to look at the main bearings. Mr. Paxton, who wrote the work order, testified on direct examination as follows:

"I told her we would have to take the valve cover off to start and find out what was the matter, and that is all we originally started to do, and did do.

"Q  What did she ask when she first came in to see you?
"A  She did not want to spend a great deal of money on that car as of now until we had knowledge of what we were going to do, or try to tell her what it was going to cost before we got real deep in it. She had mentioned that."

On cross-examination he testified:

"Q  That is what you were going to do, take off that cover?
"A  And going to try to give her a price. She

the contract, the undertaker will not be entitled to any compensation therefor, even if such extraordinary work or superior materials have greatly enhanced the value of the thing, and are for the benefit of the employer, unless they have been so done and used with his consent, or by his approval or acquiescence * * *." Story on Bailments, *Hire of Labor and Services,* 403-04, § 441c (9th ed).

"In construing a contract of bailment the court must, if possible, ascertain and give effect to the intention of the parties as it existed when the contract was made. The terms of the contract, if unambiguous, will control the unexpressed intention of the parties * * *.
"* * * * *.

"Where the contract is ambiguous it will be strictly or most strongly construed against the party preparing it." 8 CJS 377, Bailments § 22; *Consolidated Frtways v. Gresham Transfer,* 201 Or 623, 635, 271 P2d 647 (1954).

came in for a price. I was trying to determine the cheapest and quickest way I could to get that."

The automobile was at least operable because Mrs. Richmond drove it into defendant's place of business. We can assume that the shop foreman, or some mechanic under his supervision, did not read the work order to determine what work was authorized to be done on the automobile. The shop foreman stated that they had "to go farther." He testified:

"Q Whose decision was it to go farther?
"A I can't really remember."

He also testified that he had the work order (Exhibit #5) and that he altered it by adding the words "disassemble for inspection," and that he did not talk to Mr. or Mrs. Richmond before he made such alteration. He further testified that it requires eleven hours of a mechanic's time "to take the engine out and put back the engine where you don't repair it."

The letter of June 17 from defendant to plaintiff's counsel stated, "* * * [t]he existing bill against the car is $32.00 for taking the engine down and inspecting * * *." It is reasonable to assume that a charge for taking the valve covers off the motor and inspecting the valve keepers, which does not entail taking the entire motor out of the car frame, would require considerably less time of a mechanic at a lesser charge, and the motor would still be in the automobile as it was when Mrs. Richmond drove the car to defendant's place of business. There must be a valid indebtedness due from the plaintiff to the defendant for repairs or labor bestowed on the automobile at the request of the owner in order to perfect a possessory lien in the defendant. ORS 87.080(1); *Ross v. Spaniol et al,* 122 Or 424, 427,

251 P 900 (1927) (affirmed on rehearing, 122 Or 443, 259 P 430 (1927)).

The court instructed the jury first on the statute, ORS 87.080(1), and then told the jury:

"If you find, from the evidence, that plaintiff or his wife requested defendant to bestow labor on the automobile, and that defendant did bestow such labor, plaintiff would not be entitled to immediate possession, and defendant would be entitled to obtain [sic] possession, until the just and reasonable charges for defendant's labor were paid.

"But, if on the other hand, plaintiff or his wife did not request expressly or by implication defendant to perform labor on plaintiff's car or if defendant performed services beyond the services requested by plaintiff or his wife, defendant would not have a lien for the labor not requested even though the charges for such unauthorized labor would otherwise be just and reasonable."

The record discloses substantial evidence to support the jury finding on this matter, and no error was committed by the trial court.

The defendant next assigns as error the court's refusal to take from the jury the question of general damages. It is contended that the testimony of plaintiff, the owner, as to the value of the car at the time of the conversion is not sufficient because of his limited interest in the car as a contract purchaser, and that he was not qualified to give opinion evidence as to the market value thereof.

■ This court has held that the owner is competent to offer testimony as to the market value of the automobile at the time of conversion. In *Lewis v. Worldwide Imports, Inc.*, 238 Or 580, 584, 585, 395 P2d 922 (1964) we held:

"* * * The competency of an owner to testify

as to the market value of his own property is not conditioned upon his knowledge of the market value of other similar property in the vicinity. At least this is the rule when the testimony is given as to the value of the owner's land. * * * It is possible that the acceptance of this rule is a tacit recognition that value to the owner is a far more important factor in the indemnification of the owner than the courts are willing to admit * * * [Citations omitted]."

Also, in *Osborn v. Teague Chevrolet,* 254 Or 486, 489, 459 P2d 988 (1969) we stated:

"* * * We also continued to recognize that an owner is qualified to testify to the value of that which he owns even in the absence of his qualifications as an expert in evaluating property of the kind in question [automobile]."

In this case plaintiff was asked:

"Do you have an opinion as to the value of the car on May 27th? [Objection made to testimony overruled by court].

"THE WITNESS: $1750.
"* * * * *.

"Q That is in the condition it was then?
"A Yes.

"Q Do you have an opinion as to what the car would have been worth if it had no knock in the engine?
"A I would say about $2,000 to $2300."

On cross-examination he testified as follows:

"Q You were paying monthly payments of $95, but what was the total purchase price before interest and so forth?
"A It was about $3700."

It should also be noted that Mr. Hayes, general

manager of defendant, with many years' experience in the automobile industry, testified:

> "If the car had been what could be called a clean car, in good shape, with a good engine in it, at that time it would have been worth somewhere in the neighborhood of $1700."

We hold that the trial court did not err in allowing the plaintiff to testify as to the reasonable market value of the automobile.

■ The defendant argues that "[a] conversion action cannot be maintained against a lienholder for repossessing a chattel, where the unpaid portion of the purchase price exceeds the market value of the chattel," relying upon *Hall v. Work,* 223 Or 347, 354 P2d 837 (1960). It is correct that in *Hall* we held:

> "It is a well established general rule that in a case involving the conversion by the vendor of property held by the purchaser under a conditional sales contract, the measure of damages is the market value of the property at the time of the conversion, less the balance of indebtedness then due under the contract [Citations omitted]."

However, in *Hall* the defendant was the vendor of the automobile being sold to plaintiff under conditional sales contract and an action was brought by the plaintiff purchaser when the defendant repossessed the property. Under this set of facts there is no question but what the measure of damages is the market value of the property at the time of conversion *less the balance of indebtedness then due under the contract.* This is also true where a mortgagee repossesses from a mortgagor. *Cf. Gowin v. Heider,* 237 Or 266, 386 P2d 1 (1964). In the case at bar, the defendant had assigned the retail installment contract to the First National Bank of Oregon. If plaintiff had brought an action

against the bank this rule of damages would have applied, but the relationship of vendor-vendee had been terminated at the time of the alleged conversion. Therefore, we are of the opinion that the defendant was not entitled to an offset for any balance due by plaintiff to the bank, as the bank was not a party to this action.

There is an unliquidated claim due by the plaintiff to the First National Bank of Oregon for the balance due by plaintiff to the bank on the retail installment contract. This court has no way of knowing what sum, if any, the plaintiff will be required to pay to the bank. Mr. Tucker, in the note installment loan department of the First National Bank, was familiar with the transaction involving the sale of the Chevrolet automobile by defendant to plaintiff and of the bank's purchase of the retail installment contract and the car's subsequent repossession. He testified as follows:

"Q What is your understanding in regard to your right against Mr. Richmond in the event he defaulted in payment at any time after the revision of the contract in December?
"A My understanding is following the revising of the contract or loan on payments to bring them down within the money of Mr. Richmond at the time he went into default, we could have at that time exercised our remedy including repossession."

He was also asked to produce the original contract on the automobile, which was purchased by the bank.

"Q Why didn't you bring them? [Contracts on automobile]
"A Because I can't bring the original contract.
"Q Why couldn't you?
"A There is another action pending against Mr. Richmond, and I don't have it."

It is reasonable to presume that the only other action

that could be pending is one between the bank and the plaintiff. We find the court did not err in this respect.

■■ The defendant next assigns as error the court's refusal to allow its motion to withdraw the issue of punitive damages from the jury's consideration. As a general rule, punitive damages are not recoverable merely because a conversion takes place. The plaintiff must prove that a conversion occurred and also that defendant's wrongful conduct was attended with aggravating circumstances. *Daly v. Wolfard Bros., Inc.,* 204 Or 241, 253, 282 P2d 627 (1955). *See also Rhodes v. Beaver Finance Co.,* 247 Or 68, 427 P2d 420 (1967). *Daly* is a case somewhat similar to the case at bar wherein the plaintiff brought an action for conversion of an automobile and the jury returned a verdict in plaintiff's favor for general and punitive damages. In *Daly* the court stated:

"* * * Defendant's refusal to permit plaintiff to take his car was unequivocal; the car could be taken by plaintiff on one condition only: 'pay up everything we claim you owe—that is, the full amount of the disputed claims—and then you may take the car; otherwise, not.' This was a highhanded, wrongful, and unlawful deprivation of plaintiff's rights. It was a conversion of plaintiff's automobile under most aggravating circumstances."

The testimony regarding defendant's attitude in the present case is somewhat similar. The plaintiff testified:

"Q What happened then? [After finally finding his dismantled car.]
"A Well, I asked Mr. Paxton what did he propose to do, and he said, 'Nothing.'
"Q What did you do?
"A I asked him again and he walked off. He said, 'There's nothing I could do. I could care less

because I'm busy.' And about that time I went down to my mother and talked with her and she went in the building and she went over and asked him what did he propose to do, and he said, 'I don't propose to do anything.' "

Considering all of the testimony of the respective parties, we are of the opinion that the court did not err in submitting the question of punitive damages to the jury.

■ Four of the defendant's assignments of error relate to the introduction of evidence regarding plaintiff's dispute with the bank, who was not a party to the litigation. Defendant argues that such evidence and statements on the part of plaintiff's counsel were improper and prejudicial and require that the case be reversed. We would have to agree that some of the testimony regarding payments by the plaintiff to the bank and the bank's subsequent repossession of the automobile was irrelevant and undoubtedly prejudicial. The problem is compounded by the fact that both counsel for the plaintiff and defendant introduced considerable evidence regarding the bank's position in handling the transaction involving the plaintiff's automobile. It is difficult to see how this case could be tried without some evidence of where the bank fit into this complicated set of facts.

During plaintiff's opening statement to the jury, counsel stated that "* * * on July 3rd, Mr. Richmond made a payment to the bank of $50. On July 18th the bank sent the $50 back and said it was late." The defendant's counsel raised an objection on the grounds that this was beyond the scope of the complaint. The court called opposing counsel into chambers and after considering conflicting arguments, decided not to allow the statement that the bank repossessed the vehicle,

and would not allow evidence of the bank's bad faith in refusing to accept late payments without the assurance that counsel could later show defendant's involvement in the bank's repossession. However, in defendant's opening statement to the jury, counsel stated:

"* * * Mr. Tom Tucker, who is not associated with Fields. He is at East Portland Branch of the First National Bank, who will also be a witness in this case. He will testify as to the fact that the purchase contract had been assigned to the bank, and as to the amount that was owed on the contract as of June 1, 1969, and as to the fact that the car was repossessed by the bank ultimately."

Both counsel questioned the plaintiff regarding when the bank had repossessed the automobile. The plaintiff called Mr. Tucker, from the bank, to testify in detail regarding payments on the automobile, and the testimony was received without objection. Again, defense counsel elicited further testimony from Mr. Tucker regarding payments on the installment sales contract and repossession by the bank. This left the question in a state of confusion regarding an issue not relevant to the action before the court.

The question raised by this series of assignments of error is whether or not defendant's counsel was partly responsible, participated in, helped to create, or contributed to, the eliciting of such irrelevant and prejudicial testimony. It cannot be said, in the strictest sense, that the defendant invited the error as it was first injected into the trial by the opening statement of plaintiff's counsel. However, we cannot say that defendant's counsel did not help create or contribute to the injection of this type of testimony into the trial. It would appear to us, from the state of the record, that neither party is now in a position to complain

about the admission into evidence of the irrelevant and prejudicial testimony regarding payment of money to the bank and repossession of the automobile by the bank. Both parties shared the responsibility in submitting this testimony in the presence of the jury. *See* 5 CJS 857, 858, Appeal & Error § 1501. *See also Oregon-Wash. etc. Co. v. Spokane etc. R. Co.,* 83 Or 528, 540, 163 P 600, 163 P 989 (1917) wherein it is stated:

"* * * The defendant saw fit to go into this subject in the court below and must be held to have given its consent to the consideration by the court of the testimony adduced * * *."

If there is any remaining error, we also believe that the trial court corrected the error insofar as possible by giving the following instruction:

"There has been some testimony in the case about the First National Bank, and the fact that they ultimately repossessed the car. I instruct you that the fact that there was a repossession of the car by the bank is not a responsibility of the defendant, and therefore is no part of this lawsuit, and the fact that the bank may have acted wrongfully is no evidence that the defendant converted plaintiff's automobile or that the defendant's action warranted claim."

In *Hamilton v. Redeman,* 163 Or 324, 332, 97 P2d 194 (1939) the same problem arose and the court instructed the jury:

"* * * 'You have heard the testimony relative to what these men that were just named were doing down on the premises in relation to the construction of certain buildings * * *. The Court at this time has determined that it is immaterial as to that testimony in this case and that it perhaps should not have been admitted for your consideration. But it has been admitted; and now at this time as to

that testimony and all of it the Court takes it away from the jury and you will disregard it and forget it and erase it from your minds.' "

We held, at page 332:

"* * * If error had been committed in the reception of this testimony—and concerning that we express no opinion—the withdrawal of the testimony, accompanied by the direction to 'forget it and erase it from your minds,' prevented prejudice to the defendant * * *."

For these reasons we find no error in these assignments of error.

Affirmed.

McAllister, J., dissents.