Argued and submitted March 14, affirmed October 10, reconsideration denied
November 28, 1990, petition for review denied February 5, 1991 (311 Or 150)

John LAURSEN,
*Respondent,*

*v.*

Jeanne and Ted MORRIS,
*Appellants.*

(A8804-02156; CA A60750)

799 P2d 648

Sam F. Speerstra, Salem, argued the cause for appellants. With him on the briefs was Rhoten, Speerstra, Rinehart & Ashcroft, Salem.

H. Paul Montgomery, Portland, argued the cause for respondent. With him on the brief were Karen G. Thompson, and Acker, Underwood, Norwood & Hiefield, Portland.

Before Buttler, Presiding Judge, and Joseph, Chief Judge, and Rossman, Judge.

JOSEPH, C. J.

## JOSEPH, C. J.

Defendants appeal from a judgment on a jury verdict for conversion that awarded general and punitive damages. We affirm.

Defendants Jeanne and Ted Morris are husband and wife. Jeanne wrote a book on numerology. Her husband compiled the manuscript and organized and entered it on a computer. Plaintiff is a book designer. He works with an author's manuscript and makes decisions concerning the size and style of type, placement and size of headings, size and shape of margins, length of lines and spaces between them and the numerous other factors that go into producing a finished book. After the design is created, a typesetter creates the text as designed. The text comes from the typesetter in "galleys," which are then photocopied, cut up and pasted together by the designer in a page-by-page format known as a "mock up." The finished book will look much like the mock up. After the mock up is completed and proofread, it is given to the printer for printing and then to a book binder for assembly and completion.

Defendants contacted plaintiff in February, 1986, about their book. Plaintiff explained the design and production process to them. He told them that it was necessary that he have a final manuscript from which to work. He also explained that changes or revisions to the manuscript during the design or typesetting phase would increase the expense. Defendants said that they wanted their manuscript produced by plaintiff, a designer, rather than by a printer. Plaintiff told them that he would charge $20 per hour, in addition to out-of-pocket costs such as for typesetting, printing and binding. Defendants asked for an estimate of the total cost. Plaintiff told them that, until a mock up is completed, an estimate is difficult, because printers charge by the number of pages and copies. However, he gave them what he called a "ball park estimate" of $18,000 to $24,500, based on 1,200 soft-bound copies of a 320-page book, plus an additional $2,500 for slip-covers. Plaintiff also agreed to design a letterhead, an envelope and a business card for defendants.

On March 26, 1986, defendants gave plaintiff what they called their final draft. They told him that there would be 18 more pages coming, but after that there would be no more

changes. They also gave plaintiff an advance payment of $3,000. The parties discussed typographical changes for consistency and appearance. Plaintiff told them that he would bring to their attention any points in the book that he thought were unclear. He proceeded with the design. He prepared two-page samples of the manuscript, each with a different type style, to show defendants. He also began to design the letterhead, envelope and business card. Defendants never told him that they had a publication deadline, but he wanted to be finished by the end of the summer because of his other commitments for the fall. The parties met again on June 3, 1986, and went over questions that plaintiff had about the size and relationship of headings and subheadings. He also had questions about grammatical constructions and the usage of certain words. The parties redrafted unclear paragraphs together. They also discussed a list of words prepared by plaintiff that were erratically and randomly capitalized in the manuscript. Defendants instructed plaintiff to capitalize certain words. Plaintiff pointed out grammatical errors, and defendants told him to fix them. At that meeting, defendants gave plaintiff the final 18 pages. They also decided to move key words in the manuscript to the beginning of paragraphs in 150 places.

During June, plaintiff worked on typographical specifications for pages in the first chapter. He also produced the letterheads, envelope and business card. The parties met again on July 2, and plaintiff delivered the letterheads, envelopes and business cards. They discussed plaintiff's completed mock up of the first chapter and discussed minor refinements. Plaintiff continued working on the mock up during July and August. However, during the same period, defendants were sending him revisions of the manuscript. Plaintiff told defendants that the changes were increasing the cost of publication, but defendants said that the changes were necessary. Defendants gave plaintiff another $3,000 payment in July. In September, defendants sent him more than 30 pages of revisions. Most of the originals of those pages were already at the typesetter, so plaintiff had to prepare typographic specifications for the new material, withdraw the original pages and have them typeset, proofread and reviewed again.

In October, plaintiff completed a 300-page mock up of the introductory materials and ten chapters that incorporated all of defendants' changes. Plaintiff gave the mock up to

defendants for proofreading and warned them that further editorial revisions would be expensive. The parties met on November 18. Defendants had not finished proofreading the mock up, but they informed plaintiff that they were considering a structural change for the entire book. The parties met again on December 8. Defendants had still not finished proofreading. They indicated that there were a lot of things wrong that they needed to fix.

Plaintiff received the mock up from defendants on December 19. They had made changes on 200 of the 300 pages. Plaintiff told them that the changes would be expensive and time-consuming. He told them that they would cost at least $1,000 for typesetting charges alone. Defendants arranged a meeting on January 10, 1987, between plaintiff, themselves and a writer, whom they paid to attend in the hope that he would provide some suggestions to resolve the difficulties that they perceived in the publication process. On January 22, defendants sent plaintiff at least nine additional pages of revisions. They also paid him an additional $3,000 to apply toward typesetting costs. By February 11, plaintiff had completed the entire mock up of the book, with all of the revisions.

At defendants' request, plaintiff delivered the final mock up on February 20. They also requested a quotation for finishing the book. Plaintiff calculated that the charges incurred to date were $14,715 and, assuming that there would be no further substantial revisions, the costs for paper, printing and binding 1000 hard cover books consisting of 384 pages would be $15,230.

Defendants responded to plaintiff's estimate with a letter dated March 3, 1987, requesting an itemized statement of all costs and notifying him that it was not reasonable to proceed, because of the cost. Defendants asserted that the mock up contained errors and that plaintiff had made unauthorized changes in the manuscript. Plaintiff wrote defendants on March 23, sending them an itemized bill, including $485 for the letterheads, envelopes, business cards and related matters and $14,230 for the book's preparation. After applying the $9,000 received, plaintiff asked defendants for $5,715.

Defendants consulted with a Salem printer and asked him if what they had received from plaintiff was worth $9,000. The printer advised them that it was not. Defendants decided

that the $9,000 already paid was sufficient compensation for plaintiff's work and that the mock up was, therefore, their property. Defendants then decided to work over the mock up, make more changes, finish the book and have it printed by a printer of their choice.

On December 1, 1987, plaintiff sent defendants a reminder to pay his March 23 statement. Sometime in December, 1987, plaintiff learned that a book entitled *Numerology: Spiritual Life Vibrations* was being sold in a local bookstore. He found the book and saw that it was substantially the same as the mock up. Plaintiff received a letter dated January 6, 1988, from defendants' attorney, refusing to pay plaintiff's bill and demanding return of the $9,000.

Plaintiff's complaint contained claims for an account stated, breach of contract, the reasonable value of services rendered, an action on an account and conversion. The jury returned a special verdict, finding for plaintiff on every claim and awarding $5,715 in general damages on each claim and $10,000 in punitive damages for the conversion. The judgment indicates that plaintiff elected to recover for conversion only.

■ Defendants first assign as error the denial of their motion for a directed verdict on the conversion claim. We view the evidence, including inferences that reasonably can be drawn from it, in the light most favorable to plaintiff, *Leggett v. First Interstate Bank of Oregon,* 86 Or App 523, 528, 739 P2d 1083 (1987), to determine if there was sufficient evidence on which the jury could reach a verdict in favor of plaintiff. *Menke v. Bruce,* 88 Or App 107, 109, 744 P2d 291 (1987).

Conversion is an "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Mustola v. Toddy,* 253 Or 658, 663, 456 P2d 1004 (1969). Defendants argue that the evidence does not support plaintiff's claim that they converted his property when they kept the mock up and had it reproduced and sold to third parties. They maintain that the manuscript was the concept and intellectual property of the author, Jeanne, that plaintiff had no interest in the mock up and that they had the undisputed right to control the manuscript. They claim that plaintiff admitted in his testimony that he only provided a service. They assert that a mere

debt cannot be converted and that the evidence shows that plaintiff voluntarily delivered defendants' property to them on February 20, 1987.[1]

Plaintiff argues that the gravamen of the conversion claim is defendants' intent to exercise control over the chattel inconsistent with his rights, *Naas v. Lucas,* 86 Or App 406, 409, 739 P2d 1051, *mod* 88 Or App 141, 774 P2d 586, *rev den* 304 Or 680 (1987), and that he needed only to plead and prove a property or ownership interest of "some kind" in the property at the time of that exercise. *Cross v. Campbell,* 173 Or 477, 486, 146 P2d 83 (1944).[2] He asserts that he has never made any claim to defendant's manuscript but that his claim is based on a proprietary interest in the physical form of the design that he created. He claims that he did not intend to relinquish his ownership until defendants had paid him for it and that, even though they had paid him $9,000, the payments were for expenses only and did not compensate him for his creation of the design in the physical form of the mock up.

The jury could have found from the evidence that defendants converted plaintiff's interest in the mock up. Although both parties mischaracterize somewhat the subject of the conversion as plaintiff's design work there is sufficient evidence to prove that plaintiff designed, compiled, laid out and prepared the book for publication and that that was reflected in the mock up. The jury could have found that plaintiff had a property interest in it and, therefore, that defendants' appropriation interfered with plaintiff's interest. There was evidence that defendants took plaintiff's work product and, with only slight modifications, had it reproduced and sold to third parties as a book without fully compensating plaintiff. The court properly denied the motion for directed verdict.

Defendants' second assignment of error is that the trial court erred in denying their motion to strike plaintiff's

---

[1] Defendants also argue that, because plaintiff had no statutory lien on the mock up, he did not have an interest that could be converted. There is no merit in that assertion.

[2] We disagree with plaintiff's interpretation of *Cross;* however, we need not address that issue, because we do not decide whether, as a matter of law, his design in the form of the mock up is property that could be converted. That issue was not raised at trial or on appeal.

claim for punitive damages. Plaintiff needed to prove that defendants' conduct was wilful, wanton or malicious, *State ex rel Young v. Crookham,* 290 Or 61, 65, 618 P2d 1268 (1980), or that their conduct was attended by aggravating circumstances, *Richmond v. Fields Chevrolet Co.,* 261 Or 186, 493 P2d 154 (1972), or that their actions violated societal interests to the degree that punitive damages are necessary as a deterrent. *Noe v. Kaiser Foundation Hosp.,* 248 Or 420, 425, 435 P2d 306 (1967).

The jury could have found that defendants procured plaintiff's property without fully paying for it and intentionally used the property with the knowledge that they had not paid and would not pay for it. A plaintiff may recover punitive damages if the defendant acted with "intentional disregard of the interest of another." *McElwain v. Georgia-Pacific,* 245 Or 247, 249, 421 P2d 957 (1966); *see also Friendship Auto v. Bank of Willamette Valley,* 300 Or 522, 534-535, 716 P2d 715 (1986). The trial court did not err in submitting the issue to the jury.

■    Defendants' fourth assignment[3] is that the court erred in entering judgment on a void verdict, because plaintiff did not plead, prove or request relief in the amount that the jury awarded, $5,715. They contend that because, at the time of the trial, the complaint stated that the value of the converted property was $5,230, the verdict awarding $5,715 was excessive and against the law. They assert that ORCP 67C(2)[4] forbids judgment for any amount in excess of the demand.

Defendants' argument is premised on an erroneous reading of ORCP 67C(2), which expressly forbids a *judgment* from being entered in excess of the demand. The rule says nothing about a jury *verdict*. The trial court allowed plaintiff

---

[3] Because of our disposition of their first and second assignments of error, we need not address defendants' third assignment that the jury should not have been instructed on conversion or punitive damages.

[4] ORCP 67C(2) provides:

"Where a demand for judgment is for a stated amount of money as damages, *any judgment for money damages* shall not exceed that amount." (Emphasis supplied.)

to amend the complaint, under ORCP 23B,[5] after the verdict, but before the judgment was entered, to pray for $5,715, plus interest at the rate of 9 percent per annum from March 23, 1987. The judgment was entered only after the amended complaint was filed. Therefore, the judgment was proper under ORCP 67C(2), unless there was no evidence to support the verdict. Because defendants also assign error to the trial court's permission to file the amended complaint, we must review the evidence on that issue.

We conclude that there was evidence that plaintiff's design was worth $5,715. Defendants contend that the proof only shows that the preparation costs amounted to $14,230 and that $9,000 was paid on that account; thus, they assert, the value of the mock up could only be $5,230.[6] However, the jury could have found that $485 of the $9,000 was for the expenses for the printing and design of the letterhead, envelope and business card and that the remaining $8,515 went toward the book's costs, leaving an outstanding amount of $5,715. The court did not err in allowing plaintiff to amend his complaint. *Peterson v. City Council for City of Lake Oswego*, 32 Or App 181, 574 P2d 326 (1978).[7]

Defendants' fifth assignment of error is that the trial court should not have entered judgment awarding prejudgment interest, because there was no pleading, proof or relief requesting prejudgment interest on the conversion claim. Defendants contend that the complaint at trial did not specifically plead sufficient facts to establish that prejudgment interest was due on plaintiff's conversion claim. Prejudgment interest should not be awarded, they argue, regardless of the fact that the complaint was amended to seek interest after the verdict was entered.

---

[5] ORCP 23B provides:

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues."

[6] We note that defendants do *not* raise any issue about whether plaintiff's *evidence* of value was insufficient for a conversion claim.

[7] Defendants have not shown that they were prejudiced by the amendment of the complaint. *See Mund v. English*, 69 Or App 289, 684 P2d 1248 (1984).

A party must specifically plead a foundation for pre-judgment interest. *Gardner v. Meiling,* 280 Or 665, 676, 572 P2d 1012 (1977); *Lithia Lumber Co. v. Lamb,* 250 Or 444, 443 P2d 647 (1968). When there are different claims for relief, the pleadings and the prayer must request interest on each claim. *Carlson v. Blumenstein,* 54 Or App 380, 385, 635 P2d 380 (1981). Nonetheless, with respect to stating a claim for pre-judgment interest, the prayer is not part of the statement of the claim. Only if the facts pleaded are sufficient to state a claim for it may prejudgment interest be awarded. *See Contractors, Inc. v. Tri-Met,* 94 Or App 392, 398 n 7, 776 P2d 389 (1989).

Plaintiff's complaint at trial alleged five separate claims for relief. The first four specifically pled facts to support prejudgment interest. The fifth claim, for conversion, incorporated all of the allegations of the first four claims. The prayer for relief on each of the first four claims requested money damages and prejudgment interest at the rate of 9 percent per annum. The prayer for relief on the conversion claim did not request prejudgment interest until the amended complaint was filed, but the pleadings included facts establishing entitlement to interest. Additionally, defendants knew that evidence supporting the claim for interest was submitted to the jury, and they had an opportunity to defend against it. The trial court did not err by entering a judgment on the amended complaint awarding prejudgment interest.

Affirmed.