Argued January 21, affirmed as modified February 11, 1953

PERRY *v.* THOMAS ET AL.

253 P. 2d 299

*John H. Carson,* of Salem, argued the cause for appellants. With him on the brief was Gordon A. Ramstead, of Eugene.

*John D. Galey* and *Earl McFarlan* argued the cause

for respondent. On the brief were Galey & Galey, and Earl McFarlan, of Sweet Home.

Before WARNER, Acting Chief Justice, and ROSSMAN, BRAND, TOOZE and PERRY, Justices.

TOOZE, J.

This is an action for the conversion of a logging motor truck and trailer, brought by F. L. Perry, as plaintiff, against Walter Thomas, Charles Thomas, and Albert Yankus, copartners, dba Thomas Brothers Logging Co., as defendants. The case was tried to a jury, and a verdict was returned in favor of plaintiff for $8,500 compensatory damages and $5,000 punitive damages. Judgment was entered accordingly, and defendants appeal.

Prior to and at the time of trial, plaintiff was engaged in the log hauling business, using motor trucks and trailers for the purpose. He operated several such trucks and trailers, some of which he owned, and others of which he rented.

Defendants are engaged in the logging business. They use their own equipment to haul a part of their logs, but most of them are hauled by others under contract. From September 1, 1949, to January 1, 1950, plaintiff hauled logs for defendants under a written contract for such hauling, furnishing his own logging trucks and trailers, with drivers.

On and prior to August 31, 1949, defendants were the owners of two 1947 model Autocar log trucks, one 1947 model Walker log trailer, and one 1948 model Fruehauf log trailer. These trucks and trailers had been mortgaged by defendants to The First National

Bank of Portland. On August 31, 1949, there was a balance of $16,000 due on said mortgage indebtedness.

On August 31, 1949, by and with the consent and approval of the bank and of Oregon Truck Sales, Inc. (which had an interest in the transaction as a guarantor of the payment of the mortgage indebtedness to the bank), defendants sold and transferred to plaintiff all their right, title, and interest in and to said trucks and trailers, for the consideration of $16,000. The sale and transfer by defendants were evidenced by a written "Transfer of Equity", the important portions of which read as follows:

"1. The Mortgagor does sell, assign, transfer and set over unto the Purchaser the motor vehicle hereinabove described and does warrant that the same is free and clear of all incumbrances except the Chattel Mortgage held by the Mortgagee upon which the installments to and including the month of ———— have been paid, leaving a balance now owing in the sum of $16,000.00, less payment in the amount of $3,000.00 leaving balance of $13,000.00 to be paid in manner called for in note signed by Purchaser this date.

"2. The Purchaser does assume and agree to pay the indebtedness secured by said Mortgage and to do and perform each and every act and thing in and by said Chattel Mortgage on the part of the Mortgagor required to be kept or performed in the same manner and with the same effect as though he had originally joined in the execution thereof.

"3. The Mortgagee does hereby consent to said transfer, it being understood, however, that the Mortgagor shall remain bound by the terms of said promissory note and Chattel Mortgage in the same manner as though the Mortgagor and the Purchaser had joined in the execution thereof and were jointly and severally liable thereon.

"4. The Mortgagor does consent to any and all renewals or extensions of said promissory note or of any of the terms or conditions of said Mortgage, and does waive presentment, protest, notice of protest or of nonpayment and any other notice to which he might otherwise be entitled."

Contemporaneous with the execution of the foregoing transfer of equity and as a part of the same transaction, plaintiff paid the sum of $3,000 cash to the bank and executed and delivered to Oregon Truck Sales, Inc., his certain promissory note in the principal sum of $14,053.14, representing the balance due upon the original indebtedness, which sum, with interest, was to be paid in monthly installments of $780.73 each. At the same time, to secure the payment of said promissory note, plaintiff executed and delivered to Oregon Truck Sales, Inc., his certain chattel mortgage covering the two logging trucks and trailers in question. On the same day, Oregon Truck Sales, Inc., assigned said note and mortgage to the bank by written assignment.

Plaintiff took immediate possession of the two trucks and trailers and used them, along with other trucks and trailers, in fulfilling his contract with defendants to haul logs for them. After three or four days of hauling during the forepart of September, 1949, the motor truck to which was attached the Fruehauf trailer broke down, and it was taken to Aberdeen, Washington, for repairs. It is this equipment which is involved in the instant litigation. The repairs were completed, and the truck and trailer were put back in operation during the latter part of September. Plaintiff continued to haul logs for defendants until logging operations were compelled to close about December 31, 1949, because of snow.

Payments to plaintiff by defendants for the log hauling done were somewhat delayed, and because of this, and for other reasons which it is unnecessary to mention, plaintiff refused to renew his work for defendants in the spring of 1950, when logging operations were resumed. On or about the 1st of May, 1950, plaintiff commenced hauling logs for Firchau Brothers. On May 15, 1950, a log fell on the Fruehauf trailer, crushing it, and the truck and trailer were taken to the garage of Emert Brothers in Sweet Home, Linn county, Oregon, for repairs.

Resulting from the cessation of logging operations and from other causes, plaintiff was unable to make his monthly payments upon his indebtedness to the bank, and he became delinquent in the payment of several installments. In fact, up to June, 1950, his payments to the bank aggregated only $1,100.

Although representatives of the bank and Oregon Truck Sales, Inc., frequently talked with plaintiff about the delinquent payments and requested that something be done about them, nevertheless, neither the bank nor the Oregon Truck Sales, Inc., ever made a firm demand upon plaintiff to bring the payments up to date, nor did either threaten to repossess the property because of the delinquency. According to Walter A. Thomas, one of the defendants, he also discussed the delinquent payments with plaintiff and upon one or two occasions requested plaintiff to park the equipment at defendant's place of business until the payments were made. Thomas testified that plaintiff refused to accede to that request, stating that he was dealing with the bank and would do nothing except upon the bank's demand. These conversations, according to Thomas, occurred in April or May, 1950.

In the meantime and about May 1, 1950, plaintiff, with the cooperation of representatives of the bank and Oregon Truck Sales, Inc., arranged to sell the 1947 model truck and trailer to one Emerick of Aberdeen, Washington, for a net return of $7,077.54. This sale was completed on or about June 14, 1950, and the amount received by plaintiff out of the sale was paid to the bank to apply on the mortgage indebtedness, leaving then a balance due the bank of approximately $6,300. Defendants knew of the negotiations being carried on for this sale. The amount received by the bank upon this sale to Emerick more than paid the delinquent installments upon plaintiff's note.

As a witness for defendants, Walter A. Thomas admitted that neither the bank nor Oregon Truck Sales, Inc., had ever demanded that defendants pay the delinquent installments, nor did defendants pay the same, or any part thereof.

About June 1, 1950, plaintiff received an accidental injury and was taken to the hospital. He remained there for approximately eight days, but he was not able to return to work until about August 1, 1950. While he was in the hospital, the truck and trailer involved in this litigation was being operated for plaintiff by his employe, one Earl Oakley.

Relating to the circumstances surrounding the alleged wrongful taking of the truck and trailer by defendants, we quote from the direct testimony of defendant Walter A. Thomas as follows:

"Q Just state to the jury the circumstances under which the truck was picked up.

"A Well, I had Mr. Lee McClintock driving another truck for me, and I asked him if he seen Mr. Perry's driver, if he wouldn't drive the truck

up and leave it parked in our camp, and Lee contacted Mr. Perry's driver and he left it in our camp.

"Q How long did it stay there after it was brought up?

"A It stayed there a number of weeks, and it was taken down to a garage to have it looked at to see if it was in running order.

"Q When did you actually start foreclosure on it?

"A I don't believe we started foreclosing on it—we didn't get the final papers on it until in November. It took a period of months to do it. We figured Mr. Perry would pick the truck up."

Upon cross-examination, Thomas testified as follows to a conversation he had with Perry about the middle of May, 1950:

"Q But it was in May?

"A I will say it was in May.

"Q I want to know was it or wasn't it?

"A Yes, I will say it was in May.

"Q Early May or late May, or in the middle?

"A Somewhere around the middle of May.

"Q Was it some time after you told McClintock to bring the truck in?

"A Before.

"Q Then you told McClintock that in the middle of May?

"A Yes.

"Q And you told Perry to store it before that?

"A Yes, a day or two before.

"Q What did Perry say?

"A Perry said we couldn't get blood out of a turnip.

"Q Did he say he would park the truck, or not?

"A He said it was up to the bank, and we had no right to ask him to do that.

"Q What did you say?

"A I was between two fires.

"Q  Please answer my question. What did you say to Mr. Perry?

"A  I asked him to park the truck.

"Q  We will pass that. You say Perry told you that the bank had the right to tell him what to do with the truck. In answer to that, what did you say?

"A  I told him I was on the mortgage and had another truck involved in that, and I wasn't going to lost my money on account of that one truck.

"Q  What else was said?

"A  Not much. Perry was mad, and I was mad, and we left.

"Q  When you left, Perry hadn't parked the truck?

"A  No.

"Q  You knew he intended not to.

"* * * * *

"A  Sure.

"* * * * *

"Q  You knew that when you left; you knew that was Perry's attitude.

"A  That was Perry's attitude.

"Q  Two days later you told McClintock to tell Perry's driver—not Perry but Perry's driver— to bring the truck up to your place.

"A  In the meantime—

"Q  Answer my question.

"A  I told him later—I won't say whether it was two or three days, but it was later than that.

"Q  And before the driver got to tell the driver of Perry's to bring the truck up to camp, you knew Perry was flat on his back in the hospital because you had been there and talked to him.

"A  I had been down to the hospital and talked to him; it was before then, before he was flat on his back.

"Q  You knew it before the truck was picked up, didn't you?

"A  Yes, sure."

Although defendants visited plaintiff while he was in the hospital, they did not inform him of the instructions they had given McClintock; neither did they make any demand upon plaintiff to deliver the truck and trailer to them. Walter A. Thomas testified:

"Q You saw him in the hospital?

"A Yes, I met his wife in the restaurant, and she said Frank was hurt, and out of courtesy I walked over and talked to him.

"Q You didn't mention this at all?

"A No.

"Q You didn't tell him you told McClintock to tell his driver to park his truck at your camp?

"A No, I had told McClintock at that time.

"  *  *  *  *  *

"A I told my driver to have Perry's driver to drive the truck to my camp and park it.

"Q Did you give that instruction after this conversation with Perry?

"A After I found Perry wasn't going to do anything, there was no hope, and I thought something ought to be done.

"Q That was before Perry was in the hospital?

"A It was, yes.

"Q And you didn't tell Perry about it when you saw him?

"A I didn't, because I didn't want to upset a man who was hurt.

"Q That was from your consideration of Mr. Perry?

"A That's right."

On June 8, 1950, McClintock met Oakley and told him that Thomas wanted the truck and trailer driven to and left at defendants' logging camp. Oakley complied with those directions.

Plaintiff did not discover that the truck and trailer had been taken until after he left the hospital. What

occurred then is best illustrated by plaintiff's testimony on direct examination:

"Q  What occurred after you left the hospital with reference to this truck?

"A  Well, I couldn't find it, and I went over to the boarding house where Mr. Oakley was staying, and they said he had gone to Oregon City with the truck, and I asked the State Patrol to pick him up for taking the truck without permission, and the State Patrol couldn't find him. Then on Saturday night Mr. Oakley came up to the house for his check, and I asked him where the truck was, and he said Mr. Thomas had it out at his camp, and I asked him why it was out there, and he said Mr. Thomas stopped him and said it was his truck. He said when I asked him whose name was on the license and whose name was on the P.U.C. 'Yours', and I said, 'Why did you give it to him?' and he said, 'Well, he said it was his', and that was all I could get from Mr. Oakley.

"Q  Prior to this time had Thomas Bros. ever notified you they were going to take this truck?

"A  No."

On June 12, 1950, a communication was addressed to defendants by plaintiff's attorney as follows:

"Walter A. Thomas

Box 375

Mill City, Oregon

"Dear Mr. Thomas:

"I have been retained by Mr. F. L. Perry to represent him in the matter of his Auto-Car logging truck, P.U.C. 4-7858. Mr. Perry has informed me that you took possession of said truck on the morning of June 8, 1950. He claims that you have no right whatsoever to the possession of said truck. If that claim is true, it would appear that you could be charged with the crime of grand larceny. However, before advising Mr. Perry to sign a criminal

complaint against you, I thought that you should be given some opportunity to explain or justify your conduct. I hope that you will be able to do that and that a settlement of the matter can be reached.

"Please contact me as soon as possible. If I do not hear from you or see you by Thursday, June 15, 1950, I will advise Mr. Perry to sign the criminal complaint against you."

Under date of June 18, 1950, defendant Walter A. Thomas replied to this communication as follows:

"I received your letter today and I would like for Perry to return the motor belonging in the Autocar which he removed with out any ones permission and the 2 spare wheels which belong with the truck with in a reasonable time, or if he wants the truck back pay up the balance of $6,327.57 within the next 8 days and he can have it."

Plaintiff commenced this action on June 20, 1950. After alleging his ownership and possession of the truck and trailer on June 8, 1950, plaintiff alleged in his complaint as follows:

"III.

"That on said day in the county of Linn, state of Oregon, the defendant Walter A. Thomas, acting for himself and for and with the authority of his partners, Charles Thomas and Albert Yankus, defendants herein, unlawfully took and carried away said personal property and converted and disposed of the same to the use of the defendants, and each of them, to the damage of the plaintiff in the sum of $10,000.00.

"IV.

"That in doing the things herein alleged, the defendants, and each of them, acted maliciously and with wanton disregard for the rights of the plaintiff, and by reason thereof, the plaintiff demands

exemplary and punitive damages against the defendants, and each of them in the sum of $10,000.00."

Defendants answered, denying the material allegations of the complaint and affirmatively pleading two separate defenses. As their first affirmative defense, defendants pleaded the provision of the transfer of equity document by which their liability upon the original indebtedness to the bank continued, and alleged in substance that plaintiff had failed to make the payments in accordance with his agreement, as a result of which defendants held the truck pending the time plaintiff would make the payments on the equipment. As their second affirmative defense, defendants alleged in effect that acting upon the information they had and as the agent of the mortgagee, they directed that the equipment be left at defendants' camp until such time as payments could be paid up on the notes of plaintiff. Defendants further alleged that the truck and trailer were "left with the defendants with the consent and knowledge of the plaintiff herein who knew he was in default on the said payments on the note and mortgage, and that he intended to abandon the said equipment. That by the terms of said mortgage, defendant as agent for the mortgagee was entitled to the possession of said truck and trailer."

By his reply, plaintiff denied all the new matter contained in the answer inconsistent with or contradictory to the allegations of his complaint.

Defendants first assign as error the denial of their motion for an involuntary nonsuit. Defendants' theory upon this assignment of error may best be stated by quoting from their brief as follows:

"The complaint is unquestionably grounded on an alleged unlawful taking. No demand is alleged,

and if the possession of appellants was not wrongful, then it does not state facts sufficient to constitute a cause of action for withholding.

"The case made by respondent shows that appellants through an employee, McCLINTOCK, told an employee of respondent, Oakley, to drive the truck and trailer to the property of appellants *which the latter did without so much as demurring.* That was the conversion alleged. *The possession of appellants was, in view of the record, with the consent of respondent.* In addition to the foregoing it appeared from the record, (Plff's Ex. 'A') that respondent and appellants stood in the relationship of joint owners of the property inasmuch as they were to be considered as joint mortgagors of the property." (Italics ours.)

Basically, the first contention of defendants is founded upon the proposition that the delivery to them of the truck and trailer by the employe of plaintiff, upon their demand, rendered their taking a lawful one.

■ Oakley was an employe of plaintiff, engaged in the driving of the logging truck and trailer upon the business of plaintiff. He was the agent of plaintiff in the operation of this equipment. Any act performed by him within the real or apparent scope of his authority as such agent would, of course, be binding upon plaintiff as to third parties, but it is axiomatic that plaintiff could not be deemed bound by any act of his agent performed wholly beyond the real or apparent scope of his authority, in the absence of ratification or estoppel. 3 CJS, Agency, 138, § 231.

In 3 CJS, Agency, 140, § 231, the following rule is stated:

"The principal is bound by the act of his agent when he has placed the agent in such position that persons of ordinary prudence, reasonably conversant with business usages and customs, are thereby

led to believe and assume that the agent is possessed of certain authority, and to deal with him in reliance on such assumption.''

■ It is manifest that in employing Oakley as a truck driver, plaintiff did not place him in such position that persons of ordinary prudence and reasonably conversant with business usages and customs could assume that he had actual or apparent authority to dispose of plaintiff's property. Engaged as they were in the logging business and employing drivers to operate their own logging trucks, defendants were obviously conversant with the duties and authority of a logging truck driver. Oakley had no real or apparent authority to deliver the truck and trailer to defendants upon their demand, and his act in so doing had no effect whatever upon plaintiff's rights. The taking of the property under the circumstances, knowing it to be owned by plaintiff, constituted a wrongful taking thereof by defendants, even though Oakley consented thereto.

■ Defendants' second contention is based upon the construction which they place upon paragraph numbered 3 of the transfer of equity agreement, supra. They contend that that provision of the agreement made them joint mortgagors with plaintiff. They then state:

"Here, if they were to be considered as joint mortgagors, then, as between themselves, they must be considered joint owners. If that be so, it would follow the law of conversion pertaining to joint owners would apply. That law in the light of the facts in this case would give respondent no cause of action. In 14 Am. Jur. p. 140 the text is as follows:

" '* * * It is a general rule that trover will not lie in favor of one cotenant against another

who has taken possession of the common property, unless it can be shown that the latter did so with an intent to appropriate it to himself or otherwise to deprive the plaintiff of its use or value. * * *'

"The most that can be said against appellants is that they were simply attempting to protect themselves. No conversion was intended or committed."

It will first be observed that in paragraph 1 of the agreement defendants make an absolute sale to plaintiff of all their interest in the property, free and clear of all encumbrances except the prior chattel mortgage executed by them. That provision of the contract is wholly inconsistent with a claim that defendants retained any right of ownership in the equipment. By paragraph 2 and as a part of the consideration to be paid by him for the trucks and trailers, plaintiff assumed and agreed to pay the balance of the indebtedness secured by that mortgage.

Paragraph 3 was written into the agreement for the benefit of the bank. Apparently the bank was unwilling to approve a complete novation by accepting a new debtor in place of defendants and consented to the sale only upon the condition that defendants would continue liable until the debt was paid. As a result of these transactions between the parties, the primary responsibility for the payment of the indebtedness to the bank, as between plaintiff and defendants, became plaintiff's.

Defendants were neither joint mortgagors nor joint owners with plaintiff of this property. The sole ownership thereof, with exclusive right to possession, was in plaintiff, subject only to the provisions of the chattel

mortgage. For nonpayment of the installments due upon the note executed by plaintiff, or for other breach of the conditions of the chattel mortgage, the bank, or its assignees, only, could lawfully repossess the equipment and foreclose the mortgage. Defendants enjoyed no such rights.

■ This is not a case where the guarantor or surety has been compelled to pay the debt and is subrogated to the rights of the original creditor. The evidence is conclusive that defendants never paid anything on the mortgage indebtedness after the sale of the property to plaintiff and prior to their repossession of the equipment. The record also establishes the undisputed facts that neither the bank nor Oregon Truck Sales, Inc., ever made a firm demand upon defendants for the payment of the delinquent installments, or any part thereof, nor did they, or either of them, directly or indirectly, authorize defendants on their behalf, or on behalf of either of them, to take possession of the truck and trailer. After taking possession of this equipment, defendants made use thereof in connection with their own business. Under the facts and circumstances of this case, the taking and detention of this property by defendants, depriving plaintiff of the possession and use thereof, constituted an unlawful taking and conversion.

In the light of the facts of this case, viewed from the standpoint most favorable to defendants, the trial court properly withdrew from the jury's consideration the two separate defenses of defendants, and it also correctly instructed the jury to return a verdict in favor of plaintiff. There was no issue of fact for determination by the jury other than the question of

damages. Plaintiff was entitled to a verdict upon defendants' own testimony.

■■ Upon the question of damages, there is substantial evidence in the record to support the jury's finding of $8,500 as compensatory damages. This being true, we are bound by the verdict of the jury in that respect.

Upon the conclusion of the trial, defendants moved the court for an order taking from the consideration of the jury the matter of punitive damages. In effect, the court denied the motion and in its instructions to the jury submitted the question of punitive damages. Defendants assign that as error.

■ Punitive damages are not recoverable merely because a conversion took place. The plaintiff must prove not only that a conversion occurred, but also that defendants' wrongful conduct was attended with aggravating circumstances.

In 25 CJS, Damages, 715, § 119, the following rules are stated:

"In order that there may be a recovery of exemplary damages, there must in general be present in the circumstances some element of malice, fraud, or gross negligence, otherwise the measure of damages is such an amount as will constitute a just and reasonable compensation for the loss sustained, and nothing more. In other words, the wrongs to which exemplary damages are applicable are those which besides violating a right, and inflicting actual damages, import insult, fraud, or oppression, and are not merely injuries, but injuries inflicted in a spirit of wanton disregard of the rights of others. The burden of establishing the matter of aggravation is on the person seeking more than compensatory damages * * *."

In *Davis v. Aetna Acceptance Co.*, 293 US 328, 55
S Ct 151, 79 L ed 393, 396, Mr. Justice CARDOZO, speaking for the court, said:

> "The respondent contends that the petitioner
> was liable for a wilful and malicious injury to the
> property of another as the result of the sale and
> conversion of the car in his possession. There is no
> doubt that an act of conversion, if wilful and malicious, is an injury to property within the scope
> of this exception. Such a case was McIntyre v.
> Kavanaugh, 242 U. S. 138, 61 L. ed. 205, 37 S. Ct.
> 38, 38 Am. Bankr. Rep. 165, where the wrong was
> unexcused and wanton. But a wilful and malicious
> injury does not follow as of course from every act
> of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption
> of dominion without wilfulness or malice. Boyce
> v. Brockway, 31 N. Y. 490, 493; Laverty v. Snethen,
> 68 N. Y. 522, 527, 23 Am. Rep. 184; Wood v. Fisk,
> 215 N. Y. 233, 239, 109 N. E. 177, 35 Am. Bank.
> Rep. 46; Stanley v. Gaylord, 1 Cush. 536, 550, 48
> Am. Dec. 643; Compau v. Bemis, 35 Ill. App. 37;
> Re De.Lauro (D. C.) 1 F. Supp. 678, 679, 20 Am.
> Bankr. Rep. (N. S.) 481. There may be an honest,
> but mistaken belief, engendered by a course of
> dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done
> is a tort, but not a wilful and malicious one."

In a number of decisions by this court, awards of
punitive damages have been upheld, but in those cases
the evidence disclosed the existence of aggravating circumstances. Our latest decision in which an award of
punitive damages was upheld is *Denton v. Arnstein,*
197 Or 28, 250 P2d 407. In that case the evidence
disclosed that defendant had wilfully and deliberately
run his automobile into the rear end of the car being
driven by plaintiff, causing plaintiff to suffer personal

injuries. Immediately following the collision, defendant was arrogant and belligerent.

In *McCarthy v. General Electric Co.*, 151 Or 519, 49 P2d 993, 100 ALR 1370, we upheld an award of $1,500 punitive damages. We said: "If the evidence offered on behalf of the plaintiff is to be given full faith and credit, it seems clear that there was *a wilful and wanton* disregard of the property rights of the plaintiff." (Italics added.)

In *Pelton v. General Motors Acceptance Corporation*, 139 Or 198, 7 P2d 263, 9 P2d 128, the record showed that repossession of the automobile was accomplished in the middle of the night, several hours after plaintiff had placed his contract in good standing. There were a number of most aggravating circumstances in the case that fully justified the award of punitive damages.

In *Kingsley v. United Rys. Co.*, 66 Or 50, 57, 133 P 785, this court said:

"It is the law that in action *ex delicto* the jury may, if they are satisfied from the testimony, award what are known in the law as exemplary or punitive damages. To justify such damages, the jury must be satisfied from the testimony that the injury done was malicious or wilful and wanton in its character or committed with a bad motive or so recklessly as to imply a disregard of social obligations."

In *Martin v. Cambas*, 134 Or 257, 261, 293 P 601, we denied an award of punitive damages in a case involving false imprisonment. The court said:

"* * * It is essential in order to warrant a recovery of exemplary damages that there be present in the circumstances some element of malice, fraud or gross negligence; otherwise, the measure of damages is such an amount as will constitute a

just and reasonable compensation for the loss sustained, and nothing more: 17 C. J. 974, § 271."

Also see *Gill v. Selling,* 125 Or 587, 267 P 812, 126 Or 584, 270 P 411, 58 ALR 1556.

■ We are of the opinion that the evidence in this case is insufficient to justify an award of punitive damages against defendants. Defendants were rightfully concerned with plaintiff's failure to keep up his payments on the indebtedness. Plaintiff's default was serious. Commencing October 15, 1949, plaintiff was required to pay $780.73 per month. To May, 1950, his total payments aggregated $1,100 only. Defendants frequently discussed the matter with plaintiff. Quite understandably, they were worried because of their own continuing liability to the bank. They mistakenly thought that they had a right to possession of the truck and trailer for their own protection, and that plaintiff should not make use thereof until he had brought his payments up to date. With that end in view, they had requested plaintiff to park the equipment at their logging camp site. They did not forcibly repossess the property. After discovering the fact that his employe had left the equipment with defendants at their request, plaintiff made no real attempt to secure its return. The letter written by his attorney on June 12, 1950 constituted a threat of criminal prosecution rather than a demand for the return of the property. The record supports the conclusion that plaintiff did not really want the equipment returned. Had he wanted the equipment rather than the money, he would have proceeded in replevin. Taking the evidence as a whole, it is clear that defendants' acts were prompted by a misunderstanding by them of their legal rights. The record will not support a

conclusion that they were in any manner actuated by a spirit of malice, nor that they were guilty of any fraud. Their actions, though perhaps negligent, did not constitute gross negligence nor wilful and wanton conduct within the meaning of the law.

The judgment of the circuit court will be corrected by eliminating therefrom all that part relating to punitive damages. The judgment in favor of plaintiff for the sum of $8,500 as compensatory damages will be affirmed.