Argued and submitted September 3, 1985, Court of Appeals reversed, remanded to trial
court to reinstate judgment on the verdict for plaintiff February 11, 1986

## FRIENDSHIP AUTO SALES, INC.,
*Petitioner on Review,*

*v.*

## BANK OF WILLAMETTE VALLEY,
*Respondent on Review,*

(TC 29792; CA A30333; SC S31657)

716 P2d 715

Bryan M. Johnston, Salem, argued the cause and filed the petition for petitioner on review. With him on the petition was George Eder, Salem.

Paul DeMuniz, Salem, argued the cause and filed the brief for respondent on review. With him on the brief was Garrett, Seideman, Hemann, Robertson & Demuniz, P.C., Salem.

CAMPBELL, J.

## CAMPBELL, J.

The issue is: Did the trial court commit error when it entered a judgment for the defendant notwithstanding a jury verdict for the plaintiff for $84,000 punitive damages? We hold that the trial court did commit error. We reverse and remand to reinstate judgment on the verdict for the plaintiff.

Although after verdict the plaintiff is entitled to have the facts reviewed in a light most favorable to it, the direct evidence in this case is for the most part undisputed. During 1981 the plaintiff, Friendship Auto Sales, Inc., was engaged in the used car business in Dallas, Polk County, Oregon. It had been incorporated the previous year by John Whitesell and Ron Terry. Whitesell furnished the investment capital and Terry provided the management experience. Whitesell had money to invest as a result of his profitable home construction and land development business. Terry had worked for many years in the automobile business and was well known in the Dallas area.

The defendant, Bank of Willamette Valley, was one of two banks in Dallas. It provided financing for small local businesses including the plaintiff. The plaintiff did business with the defendant through Richard Kindwall, the vice-president, and Melford Hanlon, a loan officer. The plaintiff maintained a checking account with the defendant for use in its day-to-day business.

Most of the used cars in the plaintiff's inventory were purchased from a wholesale auction company in Portland. To finance the purchase of the cars for resale, the plaintiff entered into a flooring agreement with the defendant.[1]

The flooring agreement in effect during 1981 provided that the defendant would loan to the plaintiff 80 percent

---

[1] *Commercial Credit Co. v. Barney Motor Co.,* 10 Cal 2d 718, 76 P2d 1181, 1182 (1938) explains the flooring of automobiles by the use of trust receipts:

"The method of financing dealers in the retail sales of automobiles under the so-called 'trust receipt' has come into common practice. This method enables the retail dealer to obtain advances from a financing company to pay the purchase price to the distributor and at the same time receive possession of the automobile for the purpose of placing it on the salesroom floor for exhibition and sale to a prospective customer. Title is transferred directly from the distributor to the finance company which retains such title under the trust receipt until the amount advanced as the purchase price is repaid."

of the "cost of the vehicle." The cost was to be determined by the purchase invoice "and/or Kelly Blue Book valuations or a combination thereof." The 80 percent loan was to be "evidenced by trust receipts" due in 90 days. Interest was to be charged at the New York prime rate plus two percent. The aggregate amount of the trust receipts was not to exceed $85,000. All advances made under the flooring agreement were personally guaranteed by Whitesell and Terry. The agreement provided: "If at any time the Bank deems itself insecure or otherwise exposed to loss this agreement may be cancelled upon written notification to the Borrower."

When Terry was able to purchase an automobile at less than the Kelly Blue Book valuation, he changed the purchase invoice to reflect the Blue Book price. This practice permitted the plaintiff to borrow more money from the defendant. In October, 1981, Hanlon, the loan officer for the defendant, discovered that the purchase invoices had been changed and asked Terry about it. This led to an argument. Angry words were exchanged between Terry and Hanlon.

It was Terry's contention that increasing the purchase invoices to reflect the Blue Book price was a customary practice and within the terms of the flooring agreement. He "guessed" that he had changed the invoices which were later delivered to the defendant "30 to 35 times" and said that he had previously told Kindwall of the practice. On the other hand, Hanlon, who had recently been employed by the defendant, claimed that raising the invoices was deceitful.

Hard economic times befell the plaintiff in the fall of 1981. People were not buying used cars. Terry on behalf of the plaintiff began selling the cars back through the wholesale auction to recover at least a part of the investment. This practice compounded the plaintiff's losses, but Terry continued to purchase from and resell to the wholesaler with the hope that the general market would improve.

On Friday, December 11th, Terry called Whitesell and told him that the plaintiff corporation was in desperate financial shape. Whitesell was surprised because he knew nothing about the daily operation of the car lot. Terry said that the corporation needed an additional $50,000 capital. Whitesell wanted to talk to the defendant bank.

When Terry and Whitesell arrived at the bank, late in the afternoon of December 11th, they conferred with Kindwall, the vice-president. Terry told Kindwall that the plaintiff's business was in bad shape and asked for a $50,000 loan. He also gave Kindwall a piece of paper that indicated the plaintiff had an operating loss in the sum of $64,335.28. This showed a swing of approximately $110,000 from profit to loss in the last 71 days. Kindwall interpreted the paper to mean that automobiles worth approximately $41,000 had been sold out of trust. Kindwall was "absolutely flabbergasted" and felt that the defendant bank was "faced with an horrendous problem." He was astonished that the plaintiff's car lot was still open for business and told Terry to close it. Kindwall asked Terry to leave and then conferred privately with Whitesell. He told Whitesell that he thought that Terry had stolen the money. Hanlon poked his head in the office door and Kindwall asked him if there was any money in the plaintiff's bank account. Hanlon replied that the account had already been closed.[2] At that time the plaintiff's checking account had

---

[2] This is Whitesell's version of what happened. Both Kindwall and Hanlon disagreed. Kindwall testified that he told Hanlon to put a "hold" on the plaintiff's checking account and that he did not remember Hanlon saying that the account had been "closed." Hanlon did not remember seeing Whitesell in Kindwall's office. He denied that Kindwall had instructed him to "freeze" the account and specifically testified, "I did not close that account." It was Hanlon's position that Kindwall was only "reviewing" the account. However, it was pointed out to Hanlon that in his previous deposition he had testified:

"Q. Okay, I am concerned about what you did. Did you do anything with regard to the account on December the 11th?

"A. Closed it out and applied it to the flooring.

"Q. You did that December 11th?

"A. Yeah, I did it, yes.

"Q. And how did you do it?

"A. Richard told me, Mr. Kindwall."

When the trial judge granted the plaintiff's motion for a directed verdict on the conversion cause of action, he in effect ruled that the conversion of the plaintiff's bank account by the defendant took place on Friday, December 11th. The trial judge did not detail his reasons, but he could have been persuaded by the fact that the front of one of the plaintiff's checks to the Department of Motor Vehicles, which was returned to maker for "not sufficient funds," was plainly stamped "PROCESSED Dec 11 81 Bank of Willamette Valley, Dallas, Oregon." If the plaintiff did not have sufficient funds in its account to pay a $34 check on December 11th, it could be inferred that the entire balance of $2,103.97 had been applied to the flooring account.

The conversion of the plaintiff's checking account by the defendant is an

a credit balance of $2,103.97. Kindwall ordered Hanlon to go over to the plaintiff's car lot and check the inventory.

From the time that Terry was asked to leave Kindwall's office the defendant ignored him, although previously its officers had dealt with him exclusively in the day-to-day operations of the plaintiff's business.

Whitesell and Kindwall agreed that they would meet the following morning, December 12th, to examine the plaintiff's books.

On Monday, December 14th, Kindwall invited Whitesell to a lunch meeting and gave to him a letter demanding payment of $84,840 plus interest. The letter was addressed to the plaintiff and to Whitesell and Terry individually, because of their personal guarantee. Although the amount demanded did not include a credit for the plaintiff's bank account, Kindwall told Whitesell that the defendant had previously exercised its "legal right to offset." After lunch they went to the plaintiff's car lot where Kindwall gave Terry a copy of the demand letter. Kindwall saw that the place was still open for business. They returned to the bank where Kindwall suggested that the cars be sent back to the wholesale auction where they had been purchased. Kindwall dialed the

established fact in this case. The defendant appealed the trial court's order allowing the plaintiff's motion for a directed verdict on the conversion cause of action. The Court of Appeals affirmed. The defendant did not petition for review. The conversion of the checking account is now a part of the law of this case.

Even though the jury was not required to decide the question of conversion, the above mentioned testimony of Kindwall and Hanlon is relevant to the issue in this appeal. On the question of credibility of witnesses, the jury may have decided not to believe their testimony in other areas. The trial court instructed the jury: "If you find that any person has intentionally given false testimony in some part, you should distrust the rest of that person's testimony."

On the other hand, if the jury believed that Kindwall, in the presence of Whitesell, had told Hanlon to place a "hold" on the account or "freeze" it, then the jury could have inferred that Kindwall was intentionally misleading the plaintiff into thinking that the checking account would remain in status quo until the current problem was solved when in fact the defendant was in the process of converting the account. If the defendant intentionally misled the plaintiff while committing a wrongful act, there was evidence of malice.

Both Kindwall and Hanlon used the terms "hold" and "freeze" to mean the same thing. They testified that "freezing" an account was to stop activity in it and not allow any checks to be paid without the consent of a bank officer. "Closing" an account is to reduce the balance to zero by placing the funds somewhere else.

number of the wholesaler and handed the telephone to White-sell who authorized the return.

By Wednesday, December 16th, Whitesell and Terry had agreed that they would pay off the defendant. They decided that Whitesell would pay the debt in cash and that Terry would give Whitesell a mortgage on his house for his share of the debt. On that date they went to the bank for that purpose, but the defendant's officers did not know how much money was due. By this time the defendant had moved the remaining automobiles to a location under its control.

On December 23rd the defendant sent Whitesell and Terry an itemized bill and requested immediate payment. This bill commenced with the previous demand figure of $84,840 and allowed a credit for the checking account set-off in the amount of $2,103.97. After other credits and debts, the amount demanded was $79,298.96. This balance was paid in cash by Whitesell.

Several of the plaintiff's checks drawn on the defen-dant bank were returned to the payees marked "not sufficient funds" even though the account had a balance of $2,103.97. Neither Whitesell nor Terry was told by the defendant's officers that the checks were being returned to the payees.

Among the checks returned to the plaintiff because the defendant closed the checking account were two checks payable to the Motor Vehicles Division of the State of Oregon. The payee demanded a service charge of $10 on each check for a total of $20.[3] This amount was paid by the plaintiff.

The plaintiff's amended complaint alleged that the defendant intentionally and wrongfully seized the checking account in the amount of $2,103.97 and converted it to its own use and that as a result the plaintiff was specially damaged in the amount of $20. The amended complaint further alleged that the defendant's "actions showed a wilful and arrogant disregard of the property rights of others" and that to deter

---

[3] The second check was returned to the plaintiff by the Motor Vehicles Division by a letter which included this notation:

"* * * this is the second check returned [to] your company. The total amount now owed is $88.00 (which includes a $10.00 collection fee per check). Do not send a personal check as payment."

the defendant and others from engaging in such conduct in the future, the defendant should be required to pay punitive damages in the sum of $168,000.[4]

The trial court directed a verdict for the plaintiff on the conversion cause of action.[5] It ruled that the defendant exercised dominion and control over the bank account prior to the time that the defendant gave the plaintiff written notice under the flooring agreement.[6] Therefore, the jury was instructed that it must return a verdict for the plaintiff in the amount of $20—the service charges on the two checks which the plaintiff was required to pay. The defendant's motion for a directed verdict on the issue of punitive damages was denied.

The sole issue submitted to the jury was punitive damages. The jury returned a verdict for $84,000. The defendant moved for a judgment notwithstanding the verdict on the grounds that there was no evidence that its action was willful, wanton, malicious or in any manner aggravated or that it acted in other than a good faith belief that it had a right to apply the funds in the checking account to the plaintiff's debt.

The trial court granted the defendant's motion. In granting the motion, it stated in part:

"In this case, * * * we have another question that is involved, and that is whether or not [defendant] actually

---

[4] In a conversion case, *Douglas v. Humble Oil,* 251 Or 310, 315, 445 P2d 590 (1968), this court reversed the trial court and reinstated a jury verdict for punitive damages. We said that the jury could have found from the evidence that the defendant's "conduct was an *arrogant* invasion of the rights of the plaintiffs." (Emphasis added.) This is the only case from this court in which we have found the use of the term "arrogant" in connection with punitive damages.

[5] The plaintiff's amended complaint contained two other causes of action. They were dismissed and we are not concerned with them.

[6] The plaintiff was under no legal obligation to keep a checking account in the defendant's bank. There was no relationship between the checking account and the flooring agreement. There is no direct evidence on the subject, but it can be inferred that the plaintiff maintained the checking account with the defendant for convenience and to promote its good will with the bank. The relationship between the plaintiff and defendant as to the checking account was described by the trial judge.

"* * * that is a rather unique power and real unilateral power that the Bank has, that they have a right to come and take a person's money * * * without notice to the person and take priority over any person that may have an outstanding check against that account and to the detriment of the person that has the account.

"Because of this unique power that they have, they have a unique responsibility also to make sure that they are correct in exercising that power."

wrongfully did it or whether this was merely a technical error in not waiting until [it] gave written notice. All the facts and circumstances were the same except for the giving of written notice. The ultimate issue as far as any decision in this case is to determine whether or not * * * reasonable minds could differ as to whether or not the Bank acted reasonably in exercising the authority [defendant was] given under the contract and terminating the contract and demanding payment on the remaining money due and owing."

"I can conceive of no reasonable minds differing as to whether or not [defendant] * * * under the terms of that [flooring agreement] acted unreasonably on Monday [December 13th] sometime between 1:00 or 12:00 o'clock to give that written notice and cancel the contract. And because of my interpretation of that, I view this as a technical error that was made by [defendant], made in good faith, to seize the account * * * at 3:30 or sometime shortly after 3:30 Friday afternoon [December 11th] rather than waiting until 1:00 on Monday. And this would not appear * * * to be the type of case where the societal interests are such as to require a penalty to [defendant] for the actions. So I will grant your motion for a judgment notwithstanding the verdict as far as punitive damages."

The plaintiff appealed to the Court of Appeals, assigning as error the trial court's order "granting defendant's motion for judgment notwithstanding the verdict on the question" of punitive damages.

The defendant cross-appealed setting out two alleged errors by the trial court: (1) the order directing a verdict for the plaintiff on the plaintiff's conversion claim for relief, and (2) the order denying defendant's motion for a directed verdict on the plaintiff's conversion claim.

The Court of Appeals affirmed without opinion. 72 Or App 591, 696 P2d 24 (1985). Only the plaintiff petitioned this court for review. The plaintiff's points for reversal include allegations that the trial judge granted the judgment n.o.v. as to punitive damages when there was evidence from which the jury could have found that the defendant's conduct merited the damages and that plaintiff's right to a jury trial within the context of Article VII (Amended), section 3, of the Oregon Constitution had been violated.[7]

_____

[7] The plaintiff's petition for review in this court also included a claim that there

The relevant portion of Article VII (Amended), section 3, is:

"In actions at law, where the value in controversy shall exceed $200, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court in this state, unless the court can affirmatively say there is no evidence to support the verdict."[8]

This court allowed the plaintiff's petition for review.[9]

appears to be a split between the panels of the Court of Appeals as to when the question of punitive damages should be submitted to the jury. We find it unnecessary to address this point.

[8] In a law review article written by Hall S. Lusk, former Chief Justice of this court, in the December 1955 issue of the Oregon Law Review, entitled "Forty-Five Years of Article VII, Section 3, Constitution of Oregon," 35 Or L Rev 1, he relates that the amended version of Article VII, section 3, was adopted by the voters of Oregon by the initiative process in November 1910, after being sponsored by the People's Power League of Oregon. That organization argued in the Voters' Pamphlet that the purpose of the amendment was to "simplify procedure on appeals to the Supreme Court and remove the pretext for new trials in those cases in which substantial justice is done by verdict and judgment, but in which the trial court may have made a technical mistake; * * *." 35 Or L Rev at 1.

In November, 1974, the voters of Oregon further amended Article VII, section 3, by increasing "the value in controversy" from $20 to $200.

[9] Prior to oral argument, we notified counsel that we would be interested in their respective answers to the following question:

"Is a verdict for punitive damages a determination of a 'fact' like the jury's determination of compensatory damages for the injury suffered by a plaintiff, or is the fixing of punitive damages more a judgmental function more akin to imposing of a sentence on a defendant?"

Counsel for both the plaintiff and defendant pointed out to us that we had previously answered the above question in *Van Lom v. Schneiderman,* 187 Or 89, 106, 210 P2d 461 (1949). There we said that it had been suggested that this court might have the power to interfere with a verdict for punitive damages even though it lacks that power as to compensatory damages and that a part of the suggestion "seems to be that in awarding exemplary damages a jury acts something like a judge in passing sentence on the defendant in a criminal case * * *." 187 Or at 106. We answered the question as follows:

"In our judgment no valid distinction, so far as the present question is concerned, can be drawn between compensatory and exemplary damages. It is impossible for the jury to arrive at the amount to be assessed against the defendant by way of punishment without considering and deciding questions of fact. It must determine first whether there was malice, and, if so, the degree of that malice, both of them questions of fact.

"* * * * *

"It is quite true that the infliction of punitive damages in a civil action bears a resemblance to a criminal penalty, * * *. But, while considerations of this kind serve perhaps to emphasize to some extent the anomalous character of exemplary

The parties meet head-on because of the way the broad issue in this case has been framed. The plaintiff claims that there is evidence from which the jury could have awarded punitive damages and the defendant contends that there is no evidence which would justify such an award.

"Punitive damages are allowed in Oregon to punish a willful, wanton or malicious wrongdoer and to deter that wrongdoer and others similarly situated from like conduct in the future." *State ex rel Young v. Crookham,* 290 Or 61, 65, 618 P2d 1268 (1980).[10]

The parties have both cited *Lee v. Wood Products Credit Union,* 275 Or 445, 449, 551 P2d 446 (1976), for the current state of the Oregon law in regard to punitive damages in conversion cases:

"It has frequently been stated that not every conversion entitles the plaintiff to punitive damages. *See, e.g., Lewis v. Devils Lake Rock Crushing Co.,* 274 Or 293, 545 P2d 1374 (1976); * * *; *Perry v. Thomas et al.,* 197 Or 374, 253 P2d 299 (1953). Punitive damages can be justified only under a theory of deterrence. Therefore, if the conversion is merely a technical one and the converter acts under a good faith, albeit mistaken, belief that he is legally entitled to proceed in that fashion, an award of punitive damages is inappropriate. *Lewis v. Devils Lake Rock Crushing Co., supra; Perry v. Thomas et al., supra;* Hodel, *The Doctrine of Exemplary Damages in Oregon;* 44 Or L Rev 175, 226 (1965)('Making an example will not deter future good-faith converters who honestly believe that they have a right to act.')."

---

damages, they are irrelevant to the question before us. They do not alter the essential nature of the jury's task. Under a system such as ours, where the court responds to the law and the jury to the facts, it would be difficult indeed to say that a question which for centuries has been submitted to the decision of a jury is other than a question of fact. And the reluctance of the courts, having power to do so, to interfere with the jury's decision, gives added weight to this conclusion." 187 Or at 110.

[10] We find it unnecessary in this case to attempt to make a comprehensive definition of "punitive damages."

"Although Oregon courts have recognized punitive damages in a variety of cases it is difficult to specify the kind of conduct which gives rise to punitive damages. Punitive damages have been awarded to deter wanton or reckless misconduct, the willful disregard of property rights, violation of important societal interest that sanctions would tend to prevent, aggravated disregard of professional standards, and conduct motivated by ill will or reckless disregard for the rights of others." Peters, *Punitive Damages in Oregon,* 18 Will L Rev 369, 395 (1982). (Footnotes omitted.)

The plaintiff's argument is rooted in the following language of Article VII (Amended), section 3 of the Oregon Constitution, "no fact tried by a jury shall be otherwise re-examined in any court in this state, unless the court can affirmatively say there is no evidence to support the verdict." It argues that this court, starting with *Van Lom v. Schneiderman,* 187 Or 89, 95, 210 P2d 461 (1949), has maintained a consistent case history holding that the above provision of our constitution prevents trial courts and appellate courts from questioning verdicts if they are supported by any evidence. *State ex rel Young v. Crookham, supra; Mullins v. Rowe,* 222 Or 519, 522, 353 P2d 861 (1960).[11]

The defendant argues that in an action for conversion, aggravated misconduct is required on the defendant's part before punitive damages can be awarded to the plaintiff and that there is no evidence of aggravated misconduct in this case. The defendant relies upon conversion cases where awards for punitive damages were set aside because the defendants' "actions, though perhaps negligent, did not constitute gross negligence nor wilful and wanton conduct within the meaning of the law," *Perry v. Thomas,* 197 Or 374, 395, 253 P2d 299 (1953), and where "the evidence is devoid of a showing that defendant was actuated by malice, improper motive or wilful or wanton disregard for plaintiff's rights." *Hall v. Work,* 223 Or 347, 364, 354 P2d 837 (1960).

The defendant also contends that there is no evidence that the decision to close the plaintiff's bank account without written notice "was motivated by a desire to gain

---

[11] The plaintiff also argues that when the trial judge denied the defendant's motion for a directed verdict on the question of punitive damages, he necessarily found that there was some evidence upon which to submit the plaintiff's cause to the jury. Thereafter, plaintiff contends that the trial court cannot grant the defendant's motion for a judgment notwithstanding the verdict without a re-examination of the facts previously found by the jury. Tongue, *In Defense of Juries as Exclusive Judges of the Facts,* 35 Or L Rev 143, 154 (1956).

The defendant answers the plaintiff's argument by stating that the trial judge's duty is to determine the sufficiency of the evidence while it is the jury's job to weigh the evidence. *Wagner v. Kaiser Foundation Hospitals,* 285 Or 81, 589 P2d 1106 (1979).

We need not enter this debate. There is no rule of law that prevents the trial court from changing its mind between the denial of the defendant's motion for a directed verdict and the defendant's motion for a judgment notwithstanding the verdict. This is apparently what happened in this case. *See Landauer v. Steelman,* 275 Or 135, 142, 549 P2d 1256 (1976).

some advantage or to prejudice the plaintiff in a way not possible if notice had been provided."

The crux of the defendant's argument is that the following statements by the trial court were correct. Reasonable minds could only conclude that the defendant acted reasonably in giving written notice and terminating the flooring agreement on Monday, December 14th. All the facts and circumstances between 3:30 Friday afternoon, December 11th and 1:00 p.m. on Monday, December 14th were the same except for the giving of written notice. Therefore, the failure to give written notice when the bank account was actually closed on December 11th was a technical error which was made in good faith.[12]

If the trial court is correct, this case is within the "good faith-technical error" rule of *Lee v. Wood Products Credit Union, supra.*

The reverse of the trial court's analysis is: If there was evidence from which the jury, as reasonable people, could have found that the defendant acted in bad faith, then the verdict for punitive damages must stand if the bad faith reached the level of malice.[13] If there was malice the defen-

---

[12] The trial judge instructed the jury on punitive damages as follows:

"Conversion of property alone does not entitle the plaintiff to punitive damages. Punitive damages cannot be justified where the conversion is merely a technical one or the defendant acted under a good faith but mistaken belief that the defendant was legally entitled to proceed as the defendant did."

"The plaintiff must show the conversion occurred and also the defendant acted with improper motives or with deliberate disregard for the rights of others, or that the defendant's conduct was attended with aggravating circumstances that are sufficiently arbitrary and unconscionable to constitute so grievous a violation of societal interests that the use of punitive damages is merited to deter such conduct by the defendant and others in the future."

[13] In *Wolf v. Nordstrom,* 291 Or 828, 835, 637 P2d 1280 (1981), a case not discussed in the briefs, we may have caused confusion. We said: "The court did not err in refusing to give defendant's requested instructions, however, since it misstates the law governing punitive damages awards by requiring 'malice and intentional ill will towards plaintiff.'" The requested instruction is set out in footnote 4 of the *Wolf* opinion. 291 Or at 835.

The plaintiff's brief in the *Wolf* case made the following argument:

The defendant's requested instruction is not an accurate * * * statement of the law. * * * Malice, in the sense of 'intentional ill will' is not a necessary element of an action for punitive damages. 'Malice, as a basis for punitive damages, signifies nothing more than a wrongful act done intentionally without just cause or excuse.

dant's failure to give written notice would not be a technical error because it would affect a substantial right of the plaintiff. In the case of *McElwain v. Georgia-Pacific,* 245 Or 247, 249, 421 P2d 957 (1966), this court said:

> "Malice is the term most frequently used in our decisions to define a state of mind that will justify the imposition of punitive damages. Malice, as a basis for punitive damages, signifies nothing more than a wrongful act done intentionally, without just cause or excuse. *Syfert v. Solomon,* 95 Cal App 228, 272 P 810 (1928); *Wendelken v. Stone,* 88 NJL 267, 86 A 376 (1913); *Beetschen v. Shell Pipe Line Corp.* (Mo App) 248 SW2d 66 (1952). The intentional disregard of the interest of another is the equivalent of legal malice, and justifies punitive damages for trespass. *Allison v. Hodo,* 48 Ga App 790, 67 SE2d 606, 608 (1951). Where there is proof of an intentional, unjustifiable infliction of harm with deliberate disregard of the social consequences, the question of award of punitive damages is for the jury."

We have also said: "In civil cases malice has been held to mean the intentional doing of [an] injurious act without justification or excuse." *Linkhart v. Savely,* 190 Or 484, 505, 227 P2d 187 (1951).

Even though the direct evidence in this case was largely undisputed, different inferences may be drawn from those facts by reasonable people. After verdict the plaintiff is entitled to the benefit of every favorable inference. *Young v. Crown Zellerbach,* 244 Or 251, 259, 417 P2d 394 (1966).

The first step in the trial court's analysis was: "I can conceive of no reasonable minds differing as to whether or not the Bank * * * under the terms of that [flooring agreement] acted unreasonably on Monday sometime between 1:00 or 12:00 o'clock to give that written notice and cancel the contract." This statement is correct. Under the contract the defendant only had to deem "itself insecure or otherwise

---

The intentional disregard of the interest of another is the equivalent of legal malice, and justifies punitive damages * * *.' *McElwain v. Georgia-Pacific Corporation,* 245 Or 247,421 P2d 957 (1966). It is the 'deliberate disregard of the rights of others' that gives rise to an action for punitive damages, not whether the disapproved conduct was undertaken with a good or bad motive. *Chamberlain v. Jim Fisher Motors, Inc.,* 282 Or 229, 237-238, 578 P2d 1225 (1978)."

In *Wolf* we were merely pointing out that the defendant's requested instruction was in error because it required intentional ill will as a part of malice.

exposed to loss" to cancel the contract on written notice. Reasonable minds could not differ on this point.

The trial court's second step is subject to question. It stated that all the "facts and circumstances" were the same between the seizure of the plaintiff's checking account on Friday and the giving of the written notice on Monday. The record is undisputed that during the intervening period the defendant checked the inventory of the cars on the plaintiff's lot and examined the plaintiff's books. The jury could have drawn an inference that the defendant's action in closing the checking account without first examining the inventory and the books was premature.

The trial court's final step is that it viewed the defendant's failure to give written notice as a "technical error" which was "made in good faith" to seize the account at 3:30 Friday afternoon rather than waiting until 1:00 o'clock on Monday.

The trouble with the trial court's "good faith-technical error" analysis is that the jury, as reasonable people, may have drawn different inferences from the evidence.

The jury in this case could have believed the following: Kindwall and Hanlon had a strong personal dislike for Terry and seized upon the plaintiff's financial difficulty to intentionally attempt to put Terry and the plaintiff out of business. Kindwall and Hanlon's testimony that they had no animosity toward Terry was false. Kindwall, without any justification, had jumped to the conclusion that Terry had stolen the money. Hanlon wanted to hurt Terry as a result of the previous argument. Hanlon closed the plaintiff's checking account prior to being ordered to do so by his superior. The defendant's conversion of the checking account was only a part of an intentional effort to put Terry and the plaintiff out of business. While the defendant's officers were ignoring Terry they were currying the favor of Whitesell. On more than one occasion Kindwall pointed out to Whitesell that the defendant's actions were reducing Whitesell's personal liability. The defendant wanted Whitesell's personal financial business. Whitesell's financial statement as of May 19, 1980, showed his net worth to be in excess of three million dollars. His assets included $400,000 in time deposit certificates in other banks. The financial ruin of the plaintiff corporation

would sink Terry, while Whitesell, with his strong financial position, could survive.

.The jury could have believed that if Kindwall and Hanlon had not desired to put Terry and the plaintiff out of business they would have simply asked Whitesell to pay the balance due the bank before, instead of after, the checking account was converted. The jury may have determined that would have been a reasonable course of action because Whitesell's net worth exceeded that of the defendant bank. The fact finders may have found that the defendant's conduct was aggravated by its letter of Monday, December 14th, demanding the gross amount due without allowing any credit, and then two days later, when Whitesell elected to pay the total amount due, the defendant could not give him a net pay-off figure. They could have also concluded that Kindwall was agitated when he arrived at the car lot on Monday and found that Terry had ignored his previous instruction to close the business, and as a result Kindwall went back to the bank and rushed Whitesell into authorizing the return of the automobiles to the auction company. Such a conclusion would also tend to support the theory that Kindwall and Hanlon desired to put Terry and the plaintiff out of business.

We do not say that we find these things to be true, but that the jury could so interpret the evidence.

The above factors could dispel any idea that the defendant's actions were in good faith and that the failure to give written notice was a "technical error." A technical error is an error which does not go to the substance of the issue or to the substantial rights of a party. *Hintz v. Wagner*, 25 ND 110, 140 NW 729, 734 (1913). The inferences which could have been drawn by the jury also supply the aggravated circumstances which the defendant claimed were missing in this case.

There is evidence in this case from which the jury could find that the defendant intentionally converted the plaintiff's bank account without justification or excuse and therefore malice existed. *McElwain v. Georgia-Pacific, supra.* Therefore, it follows that we cannot "affirmatively say there is no evidence to support the verdict." Or Const, Art VII (Amended), § 3. The judgment on the verdict must be reinstated by the trial court.

The Court of Appeals is reversed. This case is remanded to the trial court to reinstate the jury's verdict for punitive damages in the amount of $84,000.